# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 124

**OCTOBER TERM, A.D. 2021**

*November 8, 2021*

CARRIE ANNE BEZOLD,

**Appellant**
**(Defendant),**

**v.**

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

S-21-0023

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Senior Assistant Attorney General. Argument by Mr. Zintak.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Justice**.

[¶1]   Carrie Bezold was convicted of eight counts of forgery.  She claims the evidence was insufficient to show an intent to defraud, and that the district court erred in instructing the jury on the required intent to defraud.  We affirm.

## ISSUES

[¶2]   Ms. Bezold presents two issues, which we state as:

> 1.   Did the district court err in denying Ms. Bezold's motion for judgment of acquittal?
>
> 2.   Did the district court abuse its discretion when it instructed the jury on the required element of intent to defraud?

## FACTS

[¶3]   Carrie Bezold and her husband Christopher Bezold are residents of Sinclair, Wyoming.  In June 2019, they went out of town and asked a family friend, Michael Lesco, to house- and pet-sit for them.  After they left, Ms. Bezold sent a text message to Mr. Lesco asking that he fax some paperwork for her.  She told him that it was on her desk in a padded envelope addressed to him and that the document was already notarized but could not be faxed until June 26.  She also instructed him to fax the document from the Rawlins public library and left him a key to their truck if he needed it for the trip.

[¶4]   On June 26, 2019, Mr. Lesco went to fax the document, but instead of going to the library in Rawlins as Ms. Bezold instructed, he went to the Sinclair town hall.  Lezlee Musgrave was the town clerk, and as part of her duties, she notarized and faxed documents for members of the public.  When Mr. Lesco gave Ms. Musgrave the document Ms. Bezold had asked him to fax, she saw that it contained her notary stamp, with an indication that it had been signed and notarized by her that same day.  Because she knew that the signature on the document was not hers and that she had not notarized the document, she contacted the Sinclair chief of police, Jeff Sanders.

[¶5]   Chief Sanders examined the document, which was an application for a medical hardship withdrawal from Mr. Bezold's Thrift Savings Plan (TSP).[1]  The application required that the account holder's spouse sign it to indicate her approval of the withdrawal, and it stated, "Your spouse's signature must be notarized."  It also required that Mr. Bezold's signature be notarized and stated that "[n]o other acknowledgement is acceptable."

---

[1] Mr. Bezold participated in the thrift savings plan through his federal employment.

1

[¶6]    Chief Sanders took the application as evidence and opened an investigation.  He contacted the TSP program concerning the application and obtained copies of other medical hardship withdrawal applications that the Bezolds had submitted.  He also interviewed Ms. Bezold three times, and over the course of those interviews, she eventually admitted that between 2015 and 2019, she copied Ms. Musgrave's notary stamp onto eight TSP withdrawal applications and forged Ms. Musgrave's signature on the applications before submitting them to the TSP program.  The funds from those withdrawals were placed in the Bezolds' joint checking account.

[¶7]    The State charged Ms. Bezold with eight counts of forgery for acts committed between January 1, 2015 and June 30, 2019, and a jury trial was held from August 3, 2020 to August 5, 2020.  After the State rested, defense counsel moved for judgment of acquittal pursuant to Rule 29 of the Wyoming Rules of Criminal Procedure.  Counsel did not dispute the evidence that Ms. Bezold forged Ms. Musgrave's notary stamp and signature, but claimed that the State failed to present evidence of an intent to defraud.  The district court took the motion under advisement, and the defense rested without presenting evidence.

[¶8]    The State offered two instructions, which the district court pared down and combined into a single instruction that it gave over defense counsel's objection.  The disputed instruction, Jury Instruction No. 16, read:

> Forgery requires an intent to defraud, but it does not require that anyone actually be defrauded of money or property.
>
> It is not necessary to establish an intent to defraud a particular person or entity.

[¶9]    The jury found Ms. Bezold guilty of all eight counts of forgery.  Defense counsel then renewed the motion for judgment of acquittal and requested a ruling.  The district court denied the motion but invited counsel to renew it in writing to allow more thorough briefing on the question of intent.  Defense counsel thereafter filed a written motion for judgment of acquittal, which the court denied.  It explained:

> 7.    The State presented substantial evidence for the jury to find Defendant intended to defraud as an element of Forgery. Defendant used Lezlee Musg[r]ave's notary stamp to submit a retirement withdrawal form, both using the stamp to notarize Defendant's signature along with the spouse's signature. Defendant went through the effort to make sure she had current notary stamps to copy. When the family was on vacation, Defendant left explicit instructions on how the documents were

2

to be faxed. It was only because Ms. [sic] Lesco failed to follow these instructions that the investigation ensued. Later, when questioned by law enforcement, Defendant provided contradictory explanations as to how the notary stamp got on the documents. The false notary had been applied on multiple application[s] over several years. Defendant was utilizing the notary to complete an application to receive funds from her husband's retirement an [sic] account. In addition, the paperwork required notarization to be accepted and order [sic] for funds to be disbursed. Funds were dispersed based upon these incomplete documents.

8.     Based upon the evidence submitted the jury would be able to find beyond a reasonable doubt that Defendant intended to defraud when she used a copy of the notary stamp for both [her] and her husband's signatures.

[¶10]  The district court sentenced Ms. Bezold to concurrent three- to five-year prison terms for the eight counts but suspended the sentence in favor of three years of supervised probation.  Ms. Bezold timely appealed.

## DISCUSSION

### A.     Sufficiency of the Evidence on Intent to Defraud

[¶11]  "The standard of review for a denial of a motion for judgment of acquittal is the same as that used when an appeal claims insufficient evidence to convict because both challenge the sufficiency of the evidence." *Childers v. State*, 2021 WY 93, ¶ 19, 493 P.3d 168, 171 (Wyo. 2021) (quoting *Hightower v. State*, 2020 WY 152, ¶ 13, 477 P.3d 103, 105 (Wyo. 2020)).

> We do not reweigh the evidence or reexamine the credibility of witnesses, but examine the evidence in the light most favorable to the State. We examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith. In other words, we simply determine whether any rational trier of fact could have found that the essential elements of a charged crime were proven beyond a reasonable doubt on the evidence presented.

*Id*. (cleaned up).

3

[¶12] Forgery is statutorily defined as follows:

> (a) A person is guilty of forgery if, with intent to defraud, he:
>
> (i) Alters any writing of another without authority;
>
> (ii) Makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another who did not authorize that act, or to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when no such original existed; or
>
> (iii) Utters any writing which he knows to be forged in a manner specified in paragraphs (i) or (ii) of this subsection.

Wyo. Stat. Ann. § 6-3-602(a) (LexisNexis 2021).

[¶13] Ms. Bezold was convicted of eight counts of making a writing that purported to be the act of another who did not authorize that act, as prohibited by subsection (a)(ii). She concedes that she made the writings by copying Ms. Musgrave's notary stamp to the TSP withdrawal applications and signing Ms. Musgrave's name to them. She also admits that she was not authorized to use the notary stamp or Ms. Musgrave's signature. She nonetheless claims that there was no evidence of an intent to defraud and that the evidence was therefore insufficient to support her forgery conviction.

[¶14] As used in our forgery statute, an intent to defraud means "to act willfully and deliberately and with the specific intent to deceive or cheat." *Luedtke v. State*, 2005 WY 98, ¶¶ 29-32, 117 P.3d 1227, 1233 (Wyo. 2005). Despite our approved definition of an intent to defraud, Ms. Bezold contends that such an intent cannot be found in the absence of evidence that she intended her forgery to harm another. In particular, she asserts that because the TSP withdrawal applications were used to transfer funds from one account owned by her husband into another account owned by him, there was no harm to anyone and thus no evidence of an intent to defraud.

[¶15] In support of her argument, Ms. Bezold relies on two cases: *Ford v. State*, 2011 WY 122, 259 P.3d 1178 (Wyo. 2011), and *Dixon v. Williams*, 584 P.2d 1078 (Wyo. 1978). We conclude that both cases are distinguishable and that neither stands for the broad proposition that intent to defraud cannot be found without evidence of intent to harm another.

4

[¶16]  In *Ford*, the defendant was a therapist who worked at Campbell County Memorial Hospital (CCMH).  ¶ 4, 259 P.3d at 1179.  Over the course of a few years, she sent seven letters to different governmental entities concerning her treatment of certain clients, the services she had provided, and in some cases, her recommendations.  *Id.*  All of the letters were sent on CCMH letterhead, though she did not treat the clients at CCMH and instead treated them on her own time, in her own home, and without charge.  *Id.*

[¶17]  Ford was convicted of seven counts of forgery, and this Court reversed.  *Ford*, ¶ 1, 259 P.3d at 1179.  Our primary concern was that Ford's conduct looked nothing like forgery.  First, we held that to be forged, a signature must purport to be that of another, and since Ford had signed her own name to the seven letters, her signature could not be a forgery.  *Id.* ¶ 9, 259 P.3d at 1181.  Second, we emphasized that with forgery, the focus is on falsity as to the genuineness or authenticity of the document, rather than on the falsity of any statement contained in a legitimate document.  *Id.* ¶ 16, 259 P.3d at 1184 (quoting 10A Uniform Laws Annotated (ULA), § 224.1 (2001 and 2011 Cum. Supp.)).  We concluded that Ford's use of the CCMH letterhead "was, at worst, some sort of 'falsity' of a statement contained in a legitimate document."  *Id.* ¶ 16, 259 P.3d at 1185.

[¶18]  In so holding, we rejected the State's contention that by using CCMH letterhead, Ford had falsely represented that the statements or opinions in the letters were those of CCMH and came with its "guarantee of quality."  *Id.* ¶ 11, 259 P.3d at 1182.  We observed:

> [T]he State's contention that a document written on CCMH letterhead comes with some sort of special stature is not supported by any evidence in the record, other than the prosecutor's having said it was so (argument is not evidence).  From the materials that are in the record on appeal, such a document comes with no greater standing than that of a private agency or person eligible to conduct such counseling. Indeed, it is just as likely to be true that in many cases the assessments made by private practitioners are given more weight than those of a public hospital or other public agency.

*Id.* ¶ 11, 259 P.3d at 1183.

[¶19]  *Ford* is easily distinguishable from Ms. Bezold's case.  First, as Ms. Bezold concedes, she did not sign her own name as the notary to the applications; she signed Ms. Musgrave's.  Second, whereas the letterhead in *Ford* came with no special stature that would give the defendant's letters in that case greater standing, the evidence in this case was that notarization does give a document greater standing.  Ms. Musgrave, a certified notary, testified that persons rely on notarizations of legal and financial documents to verify the authenticity of the signatures they carry, and the TSP withdrawal applications themselves required notarization.  Finally, the TSP applications in this case could not be

described as legitimate documents that at worst contained false statements, as was the case in *Ford*. Instead, through her unauthorized use of Ms. Musgrave's notary stamp and signature, Ms. Bezold held the documents out as genuinely notarized applications when they in fact were not.

[¶20] On its facts, *Ford* is plainly distinguishable. Ms. Bezold nonetheless cites to the specially concurring opinion for the proposition that an intent to defraud "requires proof beyond a reasonable doubt that the defendant intended 'to cause injury or loss to (a person) by deceit.'" *Ford*, ¶ 19, 259 P.3d at 1185 (Voigt, J., specially concurring) (quoting *Black's Law Dictionary* 488 (9th ed. 2009)). The majority in *Ford* did not adopt the rule advanced by the specially concurring opinion, and Ms. Bezold's reliance on it is thus misplaced.

[¶21] The majority in *Ford* did, however, agree with the special concurrence that the record contained no evidence that the defendant acted with an intent to defraud. ¶¶ 13-14, 259 P.3d at 1183. In particular, it found no evidence of an intent to cause prejudice or damage "that could serve to sustain the 'intent to defraud' requirement," of the forgery statute. *Id.* ¶ 14, 259 P.3d at 1183-84 (quoting *Grable v. State*, 649 P.2d 663, 676 (Wyo. 1982), *overruled on other grounds by Vlahos v. State*, 2003 WY 103, ¶ 35, 75 P.3d 628, 637 (Wyo. 2003)). In so holding, the Court compared the circumstances in *Ford* with those in *Grable*, where it had held that evidence Grable intended to prejudice or damage another party was sufficient to sustain his conviction under the forgery statute then in effect. *Ford*, ¶ 14, 259 P.3d at 1183-84. Although this Court looked to *Grable* in *Ford*, our holdings in *Grable* belie any suggestion that we intended to adopt a bright line rule that an intent to defraud requires evidence of an intent to damage or prejudice another.

[¶22] In *Grable*, the defendant was convicted under a version of the forgery statute that, like our current statute, required a specific intent. *Grable*, 649 P.2d at 676. Unlike the current version of the statute and that in effect when we decided *Ford*, that intent did not have to be an intent to defraud; it could be an "intent to prejudice, damage **or** defraud." *Id.* (quoting Section 6-17, W.S. 1957). In the portion of *Grable* that we relied on in *Ford*, the Court had reviewed the sufficiency of the evidence to sustain the then statutory requirement of an intent to prejudice or damage. *Id.* The Court, however, separately considered the sufficiency of the evidence to find an intent to defraud. *Id.* In doing so, it did not link an intent to defraud to a finding of prejudice or damage, but instead held that "knowingly passing a forged instrument as genuine is conclusive of an intent to defraud." *Id.* (quoting 37 C.J.S. § 100, p. 104).

[¶23] Evidence of an intent to prejudice or damage another may very well show an intent to defraud, and in *Ford* we looked for any such evidence. We did not, however, hold that an intent to defraud cannot be found without it, and we did not depart from the holding in *Grable* that "knowingly passing a forged instrument as genuine is conclusive of an intent to defraud." 649 P.2d at 676.

6

[¶24] Ms. Bezold's reliance on *Dixon* is likewise misplaced. *Dixon* was a breach of contract case. 584 P.2d at 1079. The plaintiff and defendant incorporated a business in which they were the sole shareholders, and about a year later, the plaintiff offered to sell his interest to the defendant. *Id*. at 1080. They reached an agreement, and among the terms that the defendant requested was an agreement that the plaintiff would not institute or file any civil or criminal action against the defendant for checks he wrote on the corporate account. *Id*. Apparently, for some time the defendant had been signing the plaintiff's name to checks drawn on the corporate account in order to pay corporate debts. *Id*.

[¶25] The deal between the parties fell through, and the plaintiff brought an action against the defendant to recover the amount he had agreed to pay the plaintiff for his interest in the company. *Dixon*, 584 P.2d at 1080. In response, the defendant asserted that the contract was void as against public policy because it contained an agreement to suppress the investigation and prosecution of criminal activity. *Id*. In particular, the defendant asserted that his signing of the plaintiff's name on the corporate checks constituted forgery, and the contract contained an agreement to suppress the prosecution of that forgery. *Id*. The district court rejected the defense, and this Court affirmed. *Id*. at 1079, 1080-81. We explained:

> In this appeal, not only does the record lack any evidence whatsoever of an intent on the part of defendant to defraud, it in fact indicates exactly the contrary; that the checks written by the defendant and signed with plaintiff's name were used to pay legitimate corporate debts arising from the daily operations of the corporation itself. Nowhere is it even hinted, much less alleged that defendant pursued his course of action with an intent or desire to defraud anyone. With such evidence, there is no way to infer an intent to defraud.

*Id*. at 1080-81 (citing *State v. Grider*, 74 Wyo. 88, 284 P.2d 400, *reh. den.* 74 Wyo. 111, 288 P.2d 766 (1955)).

[¶26] Ms. Bezold contends that the same reasoning should apply here. She asserts that despite the unauthorized use of Ms. Musgrave's notary stamp and signature, the evidence showed that the TSP withdrawals were made for legitimate medical hardship purposes and therefore no intent to defraud may be found. We disagree.[2]

[¶27] At least somewhat implicit in *Dixon* was an understanding that because the debts paid under the plaintiff's signature were legitimate corporate debts from the daily operation

---

[2] We note that while Chief Sanders testified that he had no reason to believe the withdrawn TSP funds were not used for the medical hardship cited on the applications, Ms. Bezold's text message to her house-sitter stated that the June 26, 2019 application was for "money from dads retirement for Weston's college and [to] finish paying off the lady levi hit plus some extra vacation money."

of the corporation itself, the plaintiff and defendant had the same interest in ensuring their payment. That would suggest that the defendant was authorized to use the plaintiff's signature to pay those debts. *See* 4 Charles E. Torcia, *Wharton's Criminal Law* § 480 (15th ed., Aug. 2020 update) ("If the instrument shows on its face that the defendant signed as agent, he is not guilty of forgery."). That reasoning cannot be extended to this case. Ms. Musgrave obviously had no interest in ensuring that the Bezolds were able to make withdrawals from Mr. Bezold's TSP account, and she did not implicitly or explicitly authorize Ms. Bezold to use her notary stamp and signature.

[¶28] More importantly, in addition to signing Ms. Musgrave's name to the TSP withdrawal applications, Ms. Bezold took other actions from which a jury could infer a fraudulent intent. An intent to defraud, meaning a willful and deliberate intent to deceive, could be inferred from evidence that Ms. Bezold asked Mr. Lesco to fax the June 26, 2019 application from the public library in Rawlins rather than from the more convenient location at the Sinclair town hall where Ms. Musgrave worked. Additionally, the evidence showed that one day after the notary stamp that she had been copying onto the applications expired, Ms. Bezold, for the first time in over four years, took a new document to Ms. Musgrave for notarization. An intent to deceive could certainly be inferred from this willful and deliberate effort to obtain an updated copy of Ms. Musgrave's notary stamp, particularly when Ms. Bezold copied that updated stamp onto another application just days later.

[¶29] A fraudulent intent could also be inferred from Ms. Bezold's lack of candor when law enforcement interviewed her. *Miller v. State*, 830 P.2d 419, 424 (Wyo. 1992) ("The fabrication of false accounts by an accused criminal for the sake of diverting inquiry or casting off suspicion is a circumstance always indicative of guilt.") (quoting *Bennett v. State*, 377 P.2d 634, 638 (Wyo. 1963)); *see also Vasquez v. State*, 2016 WY 129, ¶ 15, 386 P.3d 350, 355 (Wyo. 2016). When Chief Sanders first interviewed Ms. Bezold, she denied that she had intentionally used Ms. Musgrave's notary stamp and signature on the June 26, 2019 application and claimed that somehow multiple documents had ended up on her copier and she unintentionally copied them together. In the next interview, she admitted that she had copied the notary stamp and signed Ms. Musgrave's name to the June 26, 2019 application and possibly one other application. In the third and final interview, she admitted that she had done the same thing on eight occasions between 2015 and 2019. The jury could infer from the misrepresentations that preceded Ms. Bezold's ultimate admission that she understood the deceitfulness of her conduct and tried to hide it.

[¶30] Additionally, Ms. Bezold's TSP withdrawals gave her a measure of control over the withdrawn funds, which further distinguishes this case from *Dixon*. In *Dixon*, the signed checks went directly to pay legitimate corporate debts, with no potential for personal benefit to the defendant. In this case, the funds were transferred from Mr. Bezold's TSP account to a joint account held by the Bezolds, which gave Ms. Bezold a personal benefit—

individual access to the funds.[3]  Again, we do not hold that an intent to defraud requires evidence of an intent to benefit oneself, but such evidence is certainly relevant to the question and may be evidence from which a jury could find an intent to defraud.

[¶31]  Both *Ford* and *Dixon* are factually distinguishable, and neither case held that an intent to defraud cannot be found in the absence of an intent to harm another or to achieve personal gain.  It remains our law that an intent to defraud means "to act willfully and deliberately and with the specific intent to deceive or cheat." *Luedtke*, ¶¶ 29, 32, 117 P.3d at 1233.  "[K]nowingly passing a forged instrument as genuine is conclusive of" such an intent.  *Grable*, 649 P.2d at 676; *see also Grider*, 284 P.2d at 407.  Our decision in *Lapp v. State*, 2004 WY 142, 100 P.3d 862 (Wyo. 2004), illustrates our adherence to these principles.

[¶32]  In *Lapp*, the defendant was charged with and convicted of forgery based on the following events:

> In February of 2002, Ms. Lapp asked a co-worker to notarize an automobile title bearing the name Gary Evans on the front and what Ms. Lapp represented to be Mr. Evans' signature on the back. A few months later, Mr. Evans attempted to obtain a bank loan and was asked to provide the automobile title as collateral. He searched his home and could not find the title. Although Ms. Lapp helped Mr. Evans look for the title and spoke to the bank loan officer, she did not reveal that she previously removed the title from his home, represented the signature on the back as being his and had it notarized. Mr. Evans testified the signature on the title was not his and he did not give Ms. Lapp permission to sign his name on the title. ***No evidence was presented concerning what happened to the title after it was notarized***.

*Lapp*, ¶ 4, 100 P.3d at 864 (emphasis added).

[¶33]  Lapp challenged the sufficiency of the evidence to support an intent to defraud, and we affirmed based on the following evidence:

---

[3] The record indicates that the TSP program had on file a power of attorney in Ms. Bezold's favor.  The record does not contain a copy of the power of attorney, so we do not know the extent of the authority it granted Ms. Bezold or the circumstances under which she was permitted to exercise that authority. *See Miller v. Life Care Centers of America, Inc.*, 2020 WY 155, ¶ 19, 478 P.3d 164, 170 (Wyo. 2020) ("[I]t is the policy of Wyoming courts 'to construe powers of attorney strictly, and to hold the principal not bound unless the authority is exercised within the undoubted limits prescribed by the principal.'") (quoting *Stone v. First Wyo. Bank N.A., Lusk*, 625 F.2d 332, 344 n.20 (10th Cir. 1980)).

> Ms. Howe testified that Ms. Lapp brought the title to her and asked her to notarize it for Mr. Evans. Mr. Evans testified he did not authorize Ms. Lapp to sign his name and that he went looking for the title and was unable to find it when the bank requested it before processing his loan request. He testified that although Ms. Lapp helped him search for the title, she did not tell him she had previously taken it and had it notarized. The bank loan officer testified that she also spoke to Ms. Lapp and Ms. Lapp told her they could not find the title and might have to apply for a new one. Ms. Lapp did not mention to her that she previously had the title notarized.

*Lapp*, ¶ 21, 100 P.3d at 868.

[¶34]   In *Lapp*, there was no evidence of what became of the vehicle title that the defendant signed and represented as being signed by her friend, and there is no indication that the Court considered whether the defendant intended to achieve some personal gain or cause harm to her friend.  ¶¶ 4, 21, 100 P.3d at 864, 868.  The Court instead looked only to the defendant's unauthorized signing of the title, her passing of the signature as genuine, and her covering of her actions, and based on that, found the evidence sufficient to sustain a finding of an intent to defraud.  *Id.* ¶¶ 21-22, 100 P.3d at 868.

[¶35]   The evidence in this case is comparable.  Ms. Bezold took steps to obtain a copy of Ms. Musgrave's notary stamp and ensured that she had a current copy of the stamp when the original stamp expired.  She used the notary stamp on eight TSP withdrawal applications and signed Ms. Musgrave's name to them without authority to do so.  She passed seven of the eight notarized applications as genuine and acted to keep her deception from being revealed.[4]  Considering the evidence in the light most favorable to the State, we conclude that it was sufficient to support a finding of intent to defraud.

## B.   Jury Instruction on Intent to Defraud

[¶36]   Ms. Bezold objected to the intent-to-defraud jury instruction that she challenges on appeal, and we therefore review the district court's decision for an abuse of discretion. *Bernal-Molina v. State*, 2021 WY 90, ¶ 8, 492 P.3d 904, 907 (Wyo. 2021) (citing *Haire v. State*, 2017 WY 48, ¶ 28, 393 P.3d 1304, 1311 (Wyo. 2017)).  "The district court has extensive discretion in tailoring jury instructions, so long as they correctly state the law and fairly and adequately cover the issues presented." *Mackley v. State*, 2021 WY 33, ¶ 17,

---

[4] The eighth application was the one intercepted by Ms. Musgrave when she discovered the unauthorized use of her notary stamp and signature.  *See Ford*, ¶ 15, 259 P.3d at 1184 ("One who has never had a chance to pass his forged document, or whose forgery is spotted when he tries to pass it, is nevertheless guilty of forgery.").

481 P.3d 639, 643 (Wyo. 2021) (quoting *Farrow v. State*, 2019 WY 30, ¶ 12, 437 P.3d 809, 815 (Wyo. 2019)) (cleaned up).

[¶37] Instruction No. 16 stated as follows:

> Forgery requires an intent to defraud, but it does not require that anyone actually be defrauded of money or property.
>
> It is not necessary to establish an intent to defraud a particular person or entity.

[¶38] Ms. Bezold contends that the district court erred in giving this instruction because it "obviated the need of the [S]tate to prove *intent to cause injury or loss* with the conveyance of the document." (Emphasis in original.) She further contends that the instruction undermined "the necessity of the State to prove that the writing was passed off specifically with the intent to defraud someone, and specifically the person the State identified as a victim, and who testified as the victim, Ms. Musgrave." We disagree that the instruction was deficient in this regard. As we discussed above, an intent to defraud does not require evidence of an intent to cause injury or loss, and Instruction 16 is otherwise consistent with our law.

[¶39] The first part of Instruction No. 16, which stated that "[f]orgery requires an intent to defraud, but it does not require that anyone actually be defrauded of money or property," was drawn from *Ford*:

> Forgery, like false pretenses, requires an intent to defraud, but, unlike false pretenses, it does not require that anyone be actually defrauded of his money or property. One who has never had a chance to pass his forged document, or whose forgery is spotted when he tries to pass it, is nevertheless guilty of forgery.

¶ 15, 259 P.3d at 1184 (quoting 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.7(j)(5) (2d ed. 2003 and 2010-11 Supp.)).

[¶40] In context, the statement drawn from *Ford* refers to the situation where a document is forged but no transaction is completed with the document. Nonetheless, the statement is also more broadly consistent with the holdings we have already discussed. An intent to defraud means "to act willfully and deliberately and with the specific intent to deceive or cheat." *Luedtke*, ¶¶ 29, 32, 117 P.3d at 1233. It does not require an intent to harm or that someone be harmed. For example, in *Lapp*, we found the evidence sufficient to support a forgery conviction where the defendant signed the vehicle title without authority and

11

represented the signature to be genuine when she presented it for notarization. ¶¶ 21-22, 100 P.3d at 868. There was no evidence that the forgery deprived the owner of his property or that he suffered any harm as a result of the forgery, and we did not look to whether the defendant intended such a result.[5] *Id.* ¶ 4, 100 P.3d at 864. The first part of Instruction No. 16 was therefore an accurate statement of law, and the district court did not abuse its discretion in so instructing the jury.

[¶41] The second part of the instruction, which stated that "it is not necessary to establish an intent to defraud a particular person or entity," is likewise consistent with our law. With respect to forgery, we have said that the "gravamen of this offense is an intent to defraud. The identity of the victims is not an essential element of the crime." *Thomas v. State*, 667 P.2d 658, 660 (Wyo. 1983). *Lapp* again illustrates our continued adherence to this principle. In reviewing the sufficiency of the evidence to support a finding of intent to defraud, our focus was on the defendant's deceitful actions, not the impact on others or their identities. *Lapp*, ¶¶ 21-22, 100 P.3d at 868.[6] The second part of Instruction No. 16 was therefore also an accurate statement of law, and the district court did not abuse its discretion giving it.

[¶42] Affirmed.

---

[5] The owner of the title in *Lapp* suffered the inconvenience of being required to replace the title, but that was a loss caused by the defendant's physical taking of the title, not her forgery. *Lapp*, ¶ 21, 100 P.3d at 868.

[6] It makes sense that our law does not focus on the identity of the victim(s) of a forgery. "Forgery is a crime aimed primarily at safeguarding confidence in the genuineness of documents relied upon in commercial and business activity." *Ford*, ¶ 15, 259 P.3d at 1184 (quoting LaFave, *supra*). In keeping with that goal, our law focuses on the willful and deliberate intent to deceive, and knowingly passing a forged document, rather than on the impact to and identity of any purported victim. *See Luedtke*, ¶¶ 29, 32, 117 P.3d at 1233 (intent to defraud means "to act willfully and deliberately and with the specific intent to deceive or cheat"); *Grable*, 649 P.2d at 676 ("[K]nowingly passing a forged instrument as genuine is conclusive of an intent to defraud."). Additionally, in any given act of forgery, parties may be affected differently. There may be instances where a party is both deceived and suffers a loss, or there may be instances where one party is deceived and another suffers a loss. Or, as in this case and in *Lapp*, there is a party who is deceived, but not one who suffers a discernible loss. In *Lapp*, the co-worker who was asked to notarize the signature the defendant represented to be genuine was deceived. ¶ 21, 100 P.3d at 868. In this case, the TSP program was deceived when Ms. Bezold submitted TSP withdrawal applications that she represented to be genuinely notarized documents. In any event, the pivotal showing is not the identity of the "victim" or the impact on that party; it is the willful and deliberate intent to deceive.