2021 IL App (2d) 190559-U
No. 2-19-0559 & No. 2-19-1120 cons.
Order filed November 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF ELIZABETH PORIKOS-GORGEES, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellant and Cross-Appellee, | ) ) ) | |
| and | ) ) | No. 13-D-305 |
| SAMUEL GORGEES, | ) ) ) | Honorable |
| Respondent-Appellee and Cross-Appellant. | ) ) ) | Raymond D. Collins, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Regarding Elizabeth's appeal, the appellate court reversed one of the trial court's findings of dissipation, vacated the property distribution, vacated the award of zero-dollar child support, reversed the maintenance award to Samuel, held that life insurance cannot be required to secure a property judgment, affirmed the trial court's finding of contempt, and remanded for further proceedings; regarding Samuel's cross-appeal, the appellate court affirmed the trial court's finding that Elizabeth's expenditures in connection with a blowdry business were not dissipation, affirmed the trial court's allocation of one-half of the parties' principal tax liability to Samuel, and affirmed the trial court's determination that each party is responsible for his or her own attorney fees and costs.

¶ 2    In this consolidated appeal, petitioner, Elizabeth Porikos-Gorgees, appeals from an amended judgment of dissolution of marriage (AJDOM) entered on June 21, 2019. Elizabeth also appeals the November 26, 2019, order finding her in indirect civil contempt. Respondent, Samuel Gorgees, cross-appeals from the AJDOM. With respect to Elizabeth's appeal, we affirm in part, vacate in part, reverse in part, and remand for further proceedings. We affirm the contempt finding. As to Samuel's cross-appeal, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Introduction

¶ 5    Because this record is voluminous, we include only those facts pertinent to the issues raised in the appeal and cross-appeal. Where necessary, we will supplement the facts in the analysis section of this Order. The parties were married on September 4, 2002. Four minor children were born to the marriage.[1] On November 27, 2012, the parties' marriage began undergoing an irretrievable breakdown. Elizabeth, who was 41 years of age, filed a petition for dissolution of marriage on February 14, 2013, and Samuel, who was 42 years old, filed a counterpetition for dissolution of marriage on March 13, 2013.[2]

¶ 6    In 2000, when the parties met, Samuel was working with his brother in the parking lot/ valet business in Chicago. Elizabeth was employed as a makeup artist at Mario Tricoci. After the parties married, Elizabeth quit her job and began working with Samuel in a parking lot/valet business known as Olympic Parking Lot. The parties maintained that profitable business until

---

[1] All matters pertaining to custody and parenting were resolved through agreed orders.

[2] Grounds are not at issue in this appeal.

approximately 2007, when the parking lot properties were developed, causing Olympic Parking Lot to lose its leases.

¶ 7    In 2006, the parties established Brow Art 23 Entities (Brow Art), an eyebrow threading business consisting of six corporations. ("Eyebrow threading" is a method of shaping eyebrows using threads rather than chemicals or tweezers.) Eventually, the business expanded into shopping malls in over 40 states and Puerto Rico. The parties also sold franchises.

¶ 8    No later than February 2013, Samuel ceased working for Brow Art and thereafter remained voluntarily unemployed. Elizabeth continued as the 100% shareholder of Brow Art. When the AJDOM was entered, Brow Art was in chapter 11 bankruptcy and was for sale. According to Samuel's expert business valuation, as of December 31, 2014, the combined Brow Art entities had a fair market value of $19,879,000, and, as of December 31, 2017, $11,459,000. Elizabeth's expert business valuation as of December 31, 2014, showed a combined fair market value of $15,004,000, and, as of December 31, 2017, $12,527,000.

¶ 9    In 2015, Elizabeth, without Samuel's knowledge, created Locks Rock, Inc., which did business as Ooh La La. Ooh La La was a hair styling concern, with stores located in various shopping malls around the country, that also sold related beauty products. Elizabeth funded Ooh La La by taking approximately $8 million in loans from Brow Art. However, Ooh La La was never a successful enterprise.

¶ 10    The parties owned seven parcels of real estate, including the former marital residence on Auburn Court in Highland Park, where Samuel was still living at the time of trial. They owned a condominium on Park Avenue in Highland Park (their first marital residence). At the time of trial, a tenant had recently moved into the Park Avenue property but had not yet begun paying Elizabeth rent. In 2011, the parties purchased a lot on Wilmot Road in Bannockburn improved with a single-

family residence, which Elizabeth described as a "tear-down." The parties hired an architect, intending to build a new custom home on that property. Because of the breakdown of the marriage, those plans never came to fruition, and, at the time of trial, the Wilmot Road property, now vacant, was listed for sale.

¶ 11    In 2014, Elizabeth purchased a residence on Kipling Lane in Highland Park in her mother's name. Elizabeth's stated intention was to rehab this property and sell it at a profit to satisfy an Internal Revenue Service (IRS) debt of approximately $1.5 million that she had incurred through the nonpayment of income taxes.

¶ 12    After Elizabeth filed her petition for dissolution of marriage, she began taking hefty "distributions" from Brow Art in addition to her salary. These distributions formed the basis of Samuel's claim that Elizabeth dissipated millions of dollars from the marital estate.

¶ 13                    B. Pretrial Proceedings and Orders

¶ 14                    1. *Samuel's Claims of Dissipation*

¶ 15    Samuel claimed that Elizabeth dissipated approximately $10 million. On February 5, 2016, Samuel filed his first "notice of intent to claim dissipation." Samuel alleged that Elizabeth "foreclosed" him from working for Brow Art and that she retained all of the income generated from that business. Samuel further alleged that, in 2013, after the irretrievable breakdown of the marriage, Elizabeth paid interest and penalties to the IRS due to her failure to timely pay income taxes on approximately $4 million in income. Samuel alleged a similar default and payment of interest and penalties with respect to Elizabeth's 2014 income.

¶ 16    On June 13, 2016, Samuel filed his second notice of intent to claim dissipation. He alleged that Elizabeth, using marital funds, (1) traveled to Las Vegas, Greece, Paris, the United Arab

Emirates, and other destinations for pleasure, (2) purchased real estate in Greece for her parents, and (3) purchased a Cadillac for her parents.[3]

¶ 17    On December 29, 2016, Samuel filed his third notice of intent to claim dissipation. This notice restated some of the allegations in the first two notices. Additionally, Samuel alleged that Elizabeth was engaging in unspecified unilateral acts that were devaluing Brow Art. Elizabeth filed a response denying those allegations.[4]

¶ 18    On August 11, 2017, Samuel filed his fourth notice of intent to claim dissipation. Samuel restated his allegations regarding 2013 and 2014 IRS obligations and the allegations concerning the purchases of a Cadillac and property in Greece for Elizabeth's parents. He also alleged that, in 2015, Elizabeth—despite having access to more than $8 million—neglected to pay the proper amount of federal income tax, resulting in accrued interest and penalties that were due and owing to the IRS. Additionally, Samuel alleged that, after the irretrievable breakdown of the marriage, Elizabeth increased her salary and distributions from Brow Art and invested several million dollars in Ooh La La, which became defunct.

¶ 19    On October 4, 2017, Samuel filed his fifth notice of intent to claim dissipation. He alleged that, between January 1, 2013, and the first quarter of 2017, Elizabeth took distributions of $14.5 million from Brow Art, above her usual $455,000 yearly salary. Samuel alleged that Elizabeth used the money for nonmarital purposes, including wiring money to relatives in Greece, purchasing real estate in Greece, and making payments to the National Bank of Greece, her aunt

---

[3] Elizabeth testified that she purchased the Cadillac for her mother.

[4] This was the only written response that Elizabeth filed to any of Samuel's notices of intent to claim dissipation.

and other individuals, Neiman Marcus, a construction concern, and a private detective agency. In addition, Samuel alleged that Elizabeth funded Ooh La La with loans from Brow Art.

¶ 20    On April 4, 2018, Samuel filed his sixth notice of intent to claim dissipation. He alleged that Elizabeth historically paid herself a yearly salary of $400,000. However, from January 1, 2013, to December 31, 2017, Elizabeth took yearly distributions of $3.6 million from Brow Art in addition to her annual salary. Samuel alleged that Elizabeth used this money to pay personal expenses unrelated to the marriage, such as for custom jewelry, architectural and accountancy services (related to the IRS liens), real property in Greece, pleasure travel, and purchases at high-end department stores. Samuel further alleged that, by using Brow Art to fund Ooh La La, Elizabeth diminished Brow Art's value by $8 million.

¶ 21    On May 18, 2018, Samuel supplemented his earlier notices by alleging that Elizabeth took cash from the Woodfield and Yorktown stores in Illinois and from stores in Tennessee to pay personal expenses unrelated to the marriage. Samuel also supplemented information regarding Elizabeth's purchase of a Cadillac for her mother.

¶ 22    On May 18, 2018, Samuel also filed his seventh notice of intent to claim dissipation. Samuel alleged that Elizabeth had not produced documents accounting for her use of her paychecks for approximately the past year. Samuel also alleged that Elizabeth used marital funds to pay expenses for Ooh La La and for architectural and another unknown service.

¶ 23    On June 8, 2018, Samuel filed his eighth notice of intent to claim dissipation. Samuel alleged that Elizabeth purchased six round-trip airline tickets to Greece for personal purposes, using a Brow Art credit card.

¶ 24                        2. *Pre-Distributions of the Marital Estate to Samuel*

¶ 25    On May 2, 2014, the court ordered Elizabeth to pay Samuel $50,000. The court deemed this payment to be a "pre-distribution of [Samuel's] ultimate allocation of the marital estate." On August 22, 2018 (during trial), the court ordered Elizabeth to pay Samuel another $75,000, "which payment shall be considered an advancement against [Samuel's] share of the marital estate."

¶ 26                    3. *Samuel's Award of Temporary Maintenance*

¶ 27    On March 8, 2016, the court ordered Elizabeth to pay Samuel $15,000 per month as temporary maintenance commencing on April 1, 2016. The court provided that this sum was not taxable to Samuel and not deductible by Elizabeth. The order provided that the $15,000 sum was "net" after factoring in a $2000 per month contribution from Samuel toward the children's expenses.

¶ 28                    C. The Financial Evidence at Trial

¶ 29                    1. *Elizabeth's Case-in-Chief*

¶ 30                    a. *Elizabeth-Direct Examination*

¶ 31    The 17-day trial commenced in June 2018. Elizabeth testified on direct examination as follows.

¶ 32                    i. *Brow Art*

¶ 33    In June 2006, Elizabeth noticed that eyebrow threading stores were beginning to appear in malls. While strolling through Woodfield mall, which Elizabeth described as the "busiest, biggest mall in the Chicago area," she observed no such stores and thought that she could succeed in establishing one at Woodfield. When she told Samuel of her idea, he disagreed that it could be successful. For that reason, Elizabeth became the president and sole shareholder of Brow Art. Samuel became a salaried employee of the business.

¶ 34     When Elizabeth first contacted Woodfield, the mall said no to her idea. However, the mall at Old Orchard gave her a two-month lease commencing in July 2006. Elizabeth purchased a "cart," rather than a store, to "start on a small scale." That cart turned a nice profit. Then, in September 2006, she opened a cart at Woodfield. In November 2006, Elizabeth opened a store at Woodfield. In January 2007, she opened the first out-of-state store in a mall in Brandon, Florida. Brow Art had approximately 110 stores in 28 states by the end of 2012, and 200 stores, including franchises, in 43 states at the time of trial. The cost to open a store was between $50,000 to $100,000, depending on the size of the store and the amount of work that needed to be done.

¶ 35     Elizabeth's duties included dealing with the different corporate divisions and regional managers, and working with IT, licensing, inventory, and the accounting department. She also personally performed site selection and lease negotiations. Elizabeth was in the office six or seven days a week when she was not traveling approximately once a month for business. Samuel's job was to set up stores and the point-of-sale systems, sometimes lay carpet, and deal with store employees and regional managers. Those tasks required him to travel approximately twice a month. Samuel also came into the corporate office several hours a day, three to four days a week, monitoring store cameras for employee theft. On the night of November 30, 2012, Samuel told Elizabeth that he was "done working." His last day was December 1, 2012.

¶ 36     At the end of 2012, Brow Art's gross income was approximately $18.5 million, and the net income was approximately $4 million. The gross revenue from 2012 through 2017 was between $22 million and $27 million.[5] Net revenue between 2012 and 2016 was between approximately

---

[5] Throughout her direct testimony, Elizabeth largely testified from memory rather than documents to aid her recollection, although she occasionally mentioned the existence of documents

$4.2 million and $5 million. Net revenue in 2017 was approximately $2 million. Elizabeth attributed the drop in income to the general decline in mall traffic because of Internet shopping, as well as escalating employee salaries, rents, and the costs to build out stores prior to opening. In addition, Texas, Florida, and Puerto Rico had been hit by hurricanes, which depressed business in those locations.

¶ 37                                    ii. *Ooh La La*

¶ 38    In 2015, Elizabeth created Ooh La La in consultation with a business consultant that she often used. Some malls where she had Brow Art stores wanted her to provide hair-styling services known as "blowdry bars" as a condition for renewing her leases. She also saw creating Ooh La La as a way to get Brow Art into better malls that had rejected her. Elizabeth visited blowdry bars in Chicago, Wisconsin, and Los Angeles, as well as websites, and she looked at pricing menus and services offered. The blowdry bars that she visited were street locations, but Elizabeth felt that they would be successful in malls.

¶ 39    She later discovered that, whereas Brow Art catered to a lower-income clientele, Ooh La La appealed to a higher-income demographic. To be successful, Ooh La La needed to be in an "A" mall, with stores such as Gucci, Bloomingdale's, Neiman Marcus, and Saks Fifth Avenue. Between 2015 and 2016, Elizabeth opened 10 Ooh La La stores. In 2016, she realized that Ooh La La would not be successful. She attributed the lack of success to locating in malls that were not high end and to the declining success of malls in general. Elizabeth did not walk away from Ooh La La in 2016 because Ooh La La's leases were guaranteed by Brow Art, which would have suffered financially had she abandoned Ooh La La.

---

that would support her testimony.

¶ 40                    iii. *Refutation of Samuel's Claims of Dissipation*

¶ 41    Elizabeth testified to her tax liabilities as follows. Between 2013 and the time of trial, she paid approximately $3 million in state and federal income taxes. However, she still owed approximately $1.9 million for that same period. She was unable to meet her tax obligations because she was "hit" with extraordinary expenses. Those expenses included more than $3.5 million in divorce litigation costs and fees for "both sides." Of those expenses, $500,000 remained outstanding at the time of trial. Other extraordinary expenses included costs associated with selling Brow Art and those occasioned by rising business costs and economic devastation to stores in Texas, Florida, and Puerto Rico that were hit by hurricanes. In addition, Elizabeth was paying $88,000 per year from personal and business funds for private year-round schooling for their special-needs son. The son's therapy was not included in that $88,000. Elizabeth also paid $13,000 per month "in support" to Samuel. Originally, she was ordered to pay him $15,000 per month, but he contributed $2000 per month toward their son's special schooling.

¶ 42    Next, Elizabeth admitted taking cash from Brow Art locations at Woodfield and Yorktown malls. Elizabeth's sources of funds to pay all her expenses were her paycheck, distributions from Brow Art, and "petty cash." "Petty cash" referred to cash that she removed from Brow Art's Woodfield and Yorktown stores every "two or three weeks" for two or three years prior to the time of trial. She used that cash for miscellaneous business expenses and for family needs. She paid $1500 per week in cash to a full-time nanny and $500 per week in cash to a housekeeper.

¶ 43    Next, Elizabeth denied taking cash from five Tennessee Brow Art stores, although she acknowledged that $633,958.31 was not deposited into corresponding Brow Art bank accounts

from those locations during 2015 and 2016. Elizabeth explained that Maurice[6] Blake, who was a manager/sublessee of the Tennessee stores during that period, "kept the cash and deposited it in his own account."

¶ 44 Next, Elizabeth testified to a series of $1000 wire transfers, termed "CBUSOL," from the Perfect Brow Art Florida account to another, unidentified, account. Those transfers totaled $59,800 between October 2013 and October 2016. Elizabeth initially said that they were for repairs to a family home in Greece, which had been in her family for generations. However, she later described those transfers as automatic "like monthly maintenance account transfers" from checking to savings to keep the account "like a gold account."

¶ 45 Next, Elizabeth testified to expenditures that she made in connection with the Wilmot Road property in Bannockburn. When she and Samuel purchased that property, they obtained architectural drawings for a new house to be built on it. However, after the marriage broke down, Elizabeth hired a second architect, Jeremy Stanulis, at a cost of $44,560.36, to draw new plans. Elizabeth also spent $11,811.50 for surveying, which Bannockburn required. Elizabeth never built her house, and the Wilmot Road property was for sale at the time of trial.

¶ 46 Next, Elizabeth testified that she loaned her mother $710,000 from Brow Art to purchase the Kipling Lane property "that was bought and then sold to pay the IRS."

¶ 47 Next, Elizabeth explained certain payments to individuals. She had paid rent for herself and the children to Brit Turkenbrod. Maria Dedi was Elizabeth's personal assistant, whom she paid "like $2500 to $3000" per month. Dedi traveled with Elizabeth and watched the children while Elizabeth conducted Brow Art business. Elizabeth paid Dean Andrianakos, who was an

_____

[6] Blake's first name is also spelled "Marius" in the record.

accountant for two Brow Art corporations. Elizabeth also paid a construction company called RGR $35,000 from her personal funds for the build-out of a Boston Brow Art store.

¶ 48                                    b. *Elizabeth-Cross-Examination*

¶ 49                                    i. *Samuel's Job Responsibilities*

¶ 50    Elizabeth testified that Samuel's engagement with Brow Art employees was limited to those who spoke Arabic,[7] but she could not recall any store with majority Arabic speakers. Elizabeth denied that Samuel ever held the title "manager of operations." She also denied that Samuel was ever an officer of Brow Art. However, she acknowledged that Samuel was listed on corporate documents for Perfect Brow Florida, Inc. as "vice-president." Elizabeth testified that "this was prior to us having an attorney, and I think this was like a computer filing in the basement." She then said that listing Samuel as "vice-president" was a mistake, although she acknowledged that Samuel was listed as "vice-president" until January 2013. Elizabeth testified that her attorney directed her to remove Samuel as vice-president after she filed the petition for dissolution of marriage. Elizabeth also acknowledged that Samuel was listed as a "director" on corporate documents for PB Art Franchise, Inc. until January 2013.

¶ 51                                    ii. *Cash from Woodfield and Yorktown*

¶ 52    Elizabeth testified that it was "untrue" that she had taken all of the monthly cash proceeds from the Woodfield and Yorktown Brow Art stores since about January 1, 2012. She said that she took cash from those stores for the last "two to three" years. She testified that she did not know the "exact amount" of money that she took from those stores.[8]

---

[7] Samuel, whose birth name is Salim, was born in Iraq.

[8] Documents in evidence show that Elizabeth took distributions from Woodfield and

¶ 53                                              iii. *The CBUSOL Transfers*

¶ 54      Elizabeth testified that there were transfers that went to Greece and other transfers "to maintain the gold account." She testified: "If the [$59,800] went to Greece—anything that went to Greece went for repairs for the house." She added: "I just don't think that the amount that was taken every month *** was sent there. But if it was, anything that went to Greece, it went for repairs, yes."

¶ 55                                              iv. *The Wilmot Road Property*

¶ 56      Elizabeth testified that the Wilmot Road property was listed for sale at $679,000. She testified that the architectural plans that she and Samuel had done were not complete. The architect told her that they were not complete, but she did not recall what was missing, and there was nothing that would refresh her recollection. Elizabeth testified that she decided on her own, after she filed for divorce, to tear down the existing structure on that property. She testified that the existing house was not habitable, although she had a renter in the property. She testified that the renter left because the place was not habitable. Elizabeth acknowledged that she paid Stanulis for architectural services with Brow Art funds. She testified that she used Brow Art funds because her $400,000 paycheck was insufficient to cover her expenses. She did not recall doubling her salary after she filed the petition for dissolution of marriage. Elizabeth testified that she made another payment to Stanulis from Brow Art funds because she was not cashing her paychecks.[9] Elizabeth agreed that

---

Yorktown totaling $621,365.98 between 2014 and 2018.

     [9] In her direct testimony, Elizabeth explained that the IRS closed her bank account, so her assistant put her paychecks in a drawer in the office.

she could have opened an account in which to deposit her checks,[10] but she chose not to do that, preferring to use Brow Art funds. Elizabeth testified that the cost of Stanulis's architectural drawings was included in the sale price of the Wilmot property. Elizabeth did not know whether there was a document that would support that assertion. Upon being shown the listing agreement, Elizabeth testified that it did not include the architectural drawings.

¶ 57                               v. *The Kipling Lane House*

¶ 58    Elizabeth acknowledged that the Kipling Lane house was purchased in her mother's name after she filed for divorce and without Samuel's knowledge. She agreed that she used $710,000 of Brow Art money to fund that purchase. Elizabeth testified that she put the property in her mother's name to avoid the IRS. Elizabeth's intention was to fix up the property, sell it, and use the proceeds to pay off the $1.5 million IRS debt. Elizabeth acknowledged that she put the purchase on Brow Art's books as a loan to her mother, when, in fact, it was not a loan. She testified that the rehab cost approximately $500,000, bringing her investment in the property to $1.3 million. She sold the property for $1.35 million. Elizabeth acknowledged that, during the time that she owned the property, she continued to accrue tax penalties and interest that exceeded the sale proceeds. Elizabeth testified that she intended to sell the house in what she implied was a better market, but Samuel and his attorneys stopped her from doing so.

¶ 59                           vi. *Elizabeth's Payments to Various Individuals*

---

[10] After about a year of not cashing her paychecks, Elizabeth opened a bank account in her father's name.

¶ 60    Elizabeth acknowledged that she paid Turkenbrod $45,000 from a Brow Art account. She testified that he was her landlord and that she had a lease.[11] She also acknowledged that she paid Ann Jihn $176,528 from a Brow Art account. Elizabeth testified that Jihn was her former landlord. When asked if she had a lease, Elizabeth replied, "Not on me." She testified that "Coldwell Banker probably has a copy of it." Elizabeth further acknowledged that she paid Dedi $33,615 from Brow Art between April 1, 2017, and March 23, 2018. Elizabeth testified that there was no documentation of Dedi's services.

¶ 61                    vii. *Elizabeth's Payment to RGR*

¶ 62    Elizabeth testified that her payment to RGR of $35,000 from her personal account was a "loan to the business of someone because RGR has done multiple locations of construction for our stores." She explained that the loan actually was to Brow Art, but the payment was overnighted to RGR so that RGR could begin construction.

¶ 63                    c. *Samuel-Adverse Cross-Examination*

¶ 64    After Samuel finished his third year of high school in Iraq, he worked for his father's bar. In 1991, he began working construction in Turkey, after which he moved to Greece, where he also worked construction. After Greece, Samuel moved to Canada, where he worked in a bakery. He moved to the United States in 1995. Samuel worked in the parking lot/valet business with his brothers in Chicago, and then he moved to Arizona, where he worked laying tiles. When Samuel returned to Chicago in 1999 or 2000, he again worked with his brothers in the parking lot/valet business. Eventually, Samuel and a brother leased their own parking lots in downtown Chicago and hired 40 or 50 employees. That business lasted until 2007 or 2008.

---

[11] The lease was never introduced into evidence.

¶ 65    When Elizabeth proposed the eyebrow threading business to Samuel, he said, "I will see." After Samuel and Elizabeth visited such a business, Samuel thought that they could make "serious" money at it. Samuel opened 97% of the Brow Art stores, while Elizabeth opened 6 to 10 carts. From 2007 to 2010, "maybe a few contractors" helped Samuel, but Elizabeth "absolutely" had no role in opening the stores. Samuel did "every single thing in every store even [including] threading." Elizabeth negotiated the leases. Samuel hired every employee without input from Elizabeth. He hired 900 employees and fired 200 of them without help from anyone else. He also managed all of the employees. From 2008 through 2012, Elizabeth also had nothing to do with the financial statements, other than directing, with Samuel, employees to prepare information for the accountants. After Samuel instituted the point-of-sale system in 2010, Elizabeth's activity was to bring the mail into the office. Office employees would then open the mail and pay the bills. However, Samuel testified that Elizabeth reviewed the store sales. In 2011 and 2012, Elizabeth was in the office about four hours a week.

¶ 66    Samuel hired Blake to manage the Memphis stores. Blake, who wished to buy a Brow Art franchise, sublet the Nashville stores. Samuel made a "handshake deal" with Blake for Blake to keep the cash proceeds from the Nashville stores.

¶ 67    Under questioning by his own counsel, Samuel testified that he was Brow Art's manager of operations from day one. His job required a significant amount of travel, up to 300 days per year. He dealt with signage, store openings, labor issues, licensing issues, and mall management. He testified that, within the Highland Park corporate office, "I was almost everything *** the whole nine yards."

¶ 68    Samuel denied that he told Elizabeth at the end of November 2012 that he was through working. He told Elizabeth at the beginning of 2012 that he would stop traveling at the end of that

year. However, Samuel continued to travel for business until January 2013. He identified his American Express records to verify his travel. Elizabeth removed Samuel as an officer and director of Perfect Brow Florida, Inc., after she filed the petition for dissolution of marriage.

¶ 69    Samuel took issue with Elizabeth's expenditures for Ooh La La. He testified: "We were doing eyebrows, not hair."

¶ 70    To Samuel's knowledge, the architectural plans that he and Elizabeth had drawn for the Wilmot Road house were complete.

¶ 71    Samuel testified that the parties' standard of living was higher before the divorce than currently. Regarding the business, Samuel expressed the opinion that "there is nothing left."

¶ 72                                d. *Shelly Milazza*

¶ 73    Shelly Milazza, who does data entry for Brow Art and reports to Elizabeth, testified that a friend of Elizabeth's loaned Ooh La La a total of $387,031 during 2016 and 2017.  That loan was used to pay Ooh La La's rent and for payroll. None of those funds was transferred to Elizabeth personally.

¶ 74                          D. Samuel's Case-in-Chief

¶ 75                          1. *Elizabeth—Adverse Cross-Examination*

¶ 76    Elizabeth testified that her federal and state taxes were not current, and the government was threatening to take property to satisfy those debts. For that reason, she recently paid Stanulis $7900 as a final installment on the architectural plans for the Wilmot Road property so that it could be sold. She testified: "A $500,000 sale of a property would make a huge payment to the IRS. So I was looking at the big picture."

¶ 77    The entries in Brow Art's general ledger labeled "distributions" are payments to Elizabeth for nonbusiness purposes like personal credit cards and some utilities, although she spent some of

the money on the children (specifically including the son's special schooling), legal fees, litigation costs for experts, and maintenance to Samuel. Those distributions were over and above her salary. She did not know the total amount of distributions that she had taken. If she paid for airline tickets out of a distribution, that was her assistant's mistake. Elizabeth agreed that she took approximately $8 million from Brow Art to fund Ooh La La.

¶ 78                                 E. The AJDOM

¶ 79    On June 21, 2019, the court entered its written AJDOM. Pertinent to this appeal, the court found that the parties' marriage began undergoing an irretrievable breakdown on November 27, 2012. The court found that the parties established Brow Art in 2006 and that both parties were "substantially involved" in and contributed to the business and its success. The court found that Samuel stopped working for Brow Art in or around February 2013.

¶ 80                                 1. *Ooh La La*

¶ 81    The court found that Elizabeth (1) established Ooh La La in 2014 without Samuel's knowledge, consent, or approval, (2) took loans/distributions from Brow Art of $7,889,831.05 to fund Ooh La La, and (3) never repaid those loans. The court found that those loans, which were subsequently converted to distributions, constituted a bad business decision on Elizabeth's part rather than dissipation.

¶ 82                                 2. *Dissipation*

¶ 83    The court found that (1) Samuel established a *prima facie* case of dissipation, (2) Elizabeth failed to file a formal response to any of Samuel's notices of intent to claim dissipation,[12] (3)

_____

[12] The record shows that Elizabeth filed a written response to Samuel's third notice of intent to claim dissipation.

Elizabeth failed to introduce, or seek to admit, documentation or other evidence sufficient to refute by clear and convincing evidence all of Samuel's claims of dissipation, (4) Elizabeth either admitted that she used funds for nonmarital purposes or offered only vague testimony as to the alleged purpose for which she used the funds, and (5) Elizabeth's testimony was "not credible and [evasive] when discussing the dissipation claims." Specifically, the court found that Elizabeth dissipated the following sums totaling $2,901,462.37.

¶ 84                  a. *Cash from Woodfield and Yorktown*

¶ 85      Between January 1, 2014, and February 23, 2018, Elizabeth took $621,215.18 in cash from Brow Art stores at Woodfield and Yorktown.

¶ 86                  b. *Cash from the Tennessee Stores*

¶ 87      Between January 1, 2015, and November 30, 2016, Elizabeth took cash from the Brow Art Tennessee stores in the amount of $633,958.31.

¶ 88                  c. *The National Bank of Greece*

¶ 89      Between May 29, 2014, and January 23, 2015, Elizabeth made four payments to the National Bank of Greece totaling $110,000.

¶ 90                  d. *Georgia Porikos*

¶ 91      Between January 28, 2014, and January 22, 2016, Elizabeth paid her aunt, Georgia Porikos, $121,019.02.

¶ 92                  e. *Angelo Conis*

¶ 93      On November 1, 2014, Elizabeth paid Angelo Conis $46,000 to purchase a home in Greece for her father.

¶ 94                  f. *Weil Cadillac*

¶ 95   On June 25, 2014, Elizabeth paid Weil Cadillac $50,795 to purchase a Cadillac for her mother.

¶ 96                              g. *Northwestern Dental*

¶ 97   Between October 18, 2013, and December 12, 2014, Elizabeth paid Northwestern Dental $39,899 for dental implants for her father.

¶ 98                              h. *Jason of Beverly Hills*

¶ 99   Between June 17, 2013, and June 29, 2013, Elizabeth paid Jason of Beverly Hills $127,000.

¶ 100                             i. *Louisa Conis*

¶ 101   Between December 23, 2014, and August 1, 2017, Elizabeth paid Louisa Conis $33,000.

¶ 102                             j. *CBUSOL Transfers*

¶ 103   Between October 8, 2013, and October 31, 2016, Elizabeth made 80 transfers to an unknown bank account of $59,800.

¶ 104                             k. *J. Stanulis Architects*

¶ 105   Between April 12, 2016, and April 17, 2017, Elizabeth paid Stanulis $44.560.36 for architectural drawings for a custom home that Elizabeth intended to build for herself after the irretrievable breakdown of the marriage.

¶ 106                             l. *Land Scenes, Inc.*

¶ 107   On November 12, 2015, Elizabeth paid Land Scenes, Inc. $11,811.50 in connection with the building of the custom home on the Wilmot Road property.

¶ 108                             m. *The Kipling Property*

¶ 109   Elizabeth lost a minimum of $200,000 associated with the purchase and sale of the Kipling property.

¶ 110                             n. *Travel and Entertainment*

¶ 111 Between November 4, 2013, and February 14, 2018, Elizabeth paid $140,133.40 for personal travel, vacations, and entertainment.

¶ 112                              o. *Department Stores*

¶ 113 Between April 11, 2014, and February 23, 2018, Elizabeth paid department stores, including Neiman Marcus, Macy's, Lord & Taylor, Saks Fifth Avenue, and Best Buy $21,306.78.

¶ 114                              p. *Ann Jihn*

¶ 115 Between October 30, 2013, and August 4, 2016, Elizabeth paid Ann Jihn $176,528.

¶ 116                              q. *Brit Turkenbrod*

¶ 117 Between June 26, 2017, and February 20, 2018, Elizabeth paid Brit Turkenbrod $45,000.

¶ 118                              r. *Maria Dedi*

¶ 119 Between April 1, 2017, and March 23, 2018, Elizabeth paid Maria Dedi $33,615.

¶ 120                              s. *Unaccounted-for Cash*

¶ 121 Between February 22, 2014, and July 31, 2015, Elizabeth took four cash withdrawals from Brow Art entities totaling $60,650.

¶ 122                              t. *RGR*

¶ 123 On February 12, 2016, Elizabeth paid RGR $35,000.

¶ 124                              u. *Dean Andrianakos*

¶ 125 On April 2, 2015, Elizabeth paid Andrianakos $5,700.

¶ 126                              v. *Locks Rock, Inc.*

¶ 127 On December 11, 2014, Elizabeth wrote a personal check to Locks Rock, Inc. for $25,000.

¶ 128                              w. *IRS Liability*

¶ 129 For the years 2013 through 2016, Elizabeth failed to pay the appropriate amounts of federal income taxes as they became due and owing. Instead, she used millions of dollars of marital funds

for no marital purpose. As a result, as of December 29, 2017, Elizabeth incurred $445,860.20 in penalties and interest, plus any penalties and interest that continue to accrue.

¶ 130                                3. Property Distribution

¶ 131    The court found that Elizabeth dissipated $2,901,462.37 and that the value of the remaining marital estate was $2,380,833.25. The court deducted the $445,862 IRS penalties-and-interest debt from the total marital estate and then divided the marital estate 50-50. Finding that Elizabeth had failed to reimburse the marital estate for her dissipation (minus the $445,862 IRS debt), the court awarded Samuel 100% of the parties' real estate, bank accounts, and personal property "to reach a 50% share in the marital estate." The court found that a shortfall of $134,484.50 existed and entered judgment against Elizabeth in that amount. In addition, the court ordered Elizabeth (1) to execute quit-claim deeds on each of the properties and (2) to be financially responsible for any liens or encumbrances on any of the real properties "which may have been caused by Elizabeth's actions or inactions."

¶ 132                                4. Tax Liabilities

¶ 133    The court ordered both parties to share 50% of the principal on taxes in Elizabeth's name totaling $1,459,269 as of October 30, 2018.

¶ 134                           5. Maintenance and Child Support

¶ 135    The court based its maintenance calculations on Elizabeth's yearly $455,000 salary and a $50,000 salary imputed to Samuel. The court barred Elizabeth from receiving maintenance from Samuel. The court ordered Elizabeth to pay Samuel $7100 per month in reviewable maintenance for 55 months. The court further provided that "neither party shall be obligated to pay child support to the other as the maintenance amount *** takes into consideration Samuel's contribution to

child-related expenses." The court ordered Elizabeth to procure a life insurance policy to secure the judgment against her as well as her maintenance obligation.

¶ 136                                   F. Attorney Fees

¶ 137   In paragraph 18.1 of the AJDOM, the court provided that "both parties shall be responsible to pay all of their respective [attorney] fees." In paragraph 18.3, the court provided that Samuel "shall be solely and separately responsible for the payment of his own [attorney] fees and costs incurred in this matter." The court further provided that Samuel "is hereby barred from any claim against Elizabeth for contribution to his [attorney] fees and costs incurred in this matter." Elizabeth filed a timely notice of appeal from the AJDOM, and Samuel filed a timely notice of cross-appeal.

¶ 138                               G. Post-Decree Contempt

¶ 139   On September 12, 2019, Samuel filed a petition for a rule to show cause to hold Elizabeth in indirect civil contempt for her failure to pay liens and taxes on the real estate that was awarded to him in the AJDOM. On October 25, 2019, the court ordered Elizabeth to pay amounts outstanding within 30 days. On November 26, 2019, the court found Elizabeth in contempt for failure to comply with the court's October 25, 2019, order and sentenced her to 90 days' incarceration with a purge amount of $55,000. Elizabeth filed a timely notice of appeal. The trial court stayed the contempt order pending appeal.

¶ 140                                   II. ANALYSIS

¶ 141   Preliminarily, we are constrained to comment on the hyperbolic and, at times, uncivil tone of both parties' briefs. Specifically, however, we point out Samuel's surreply brief, in which his counsel accuses Elizabeth's counsel of "xenophobic, misandrist hostility." In the response brief, Samuel's counsel also accuses Elizabeth's attorneys of a "subtext of misandry." "Misandry" is a "hatred of men." *Merriam-Websterhttps://www.meriam-webster.com/dictionary/misandry*.

"Xenophobic" obviously accuses counsel of prejudice against Samuel because he is an immigrant. Such language and attitude are disrespectful, not only of opposing counsel, but of this court. The Illinois Rules of Professional Conduct require that counsel maintain "a professional, courteous, and civil attitude toward all persons involved in the legal system." Ill. R. Prof'l Conduct (2010), Preamble (eff. Jan. 1, 2010). We note that, whatever shortcomings are present in Elizabeth's briefs, her counsel have not engaged in either xenophobia or misandry. We would be acting within our discretion to strike the surreply brief in particular. See *Biggs v. Cummins*, 16 Ill. 2d 424, 425 (1959) (court struck brief containing scandalous and impertinent material); *Smith v. Bingman*, 3 Ill. App. 65, 66 (1878) (court disapproved of insinuations in brief of unprofessional conduct by opposing attorney). We elect not to impose that sanction. Instead, we strike the offensive language from both the response brief and the surreply brief and admonish all counsel that, in the future, such disrespect will be sanctioned more severely.

¶ 142   We next address Samuel's motion to strike portions of Elizabeth's reply brief. First, Samuel argues that footnote 1 in the reply brief violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) by not citing to a page in the record for its contention. We agree that footnote 1 contains no record citation and consists of evidence *de hors* the record, in violation of Illinois Supreme Court Rule 341(j) (eff. Oct. 1, 2020) (reply brief shall be confined to strictly replying to arguments presented in appellee's brief). Therefore, we grant the motion to strike it. Second, Samuel maintains that citations to pages of the Lake County Recorder of Deeds website at page 10 of the reply brief violates Rule 341(j) because those pages contain evidence that is *de hors* the record. We agree. Elizabeth cites no authority supporting that we can take judicial notice of those matters. Consequently, we strike the argument based on the recorder's website.

¶ 143   We turn now to the merits.

¶ 144                              A. Elizabeth's Appeal—No. 2-19-0559

¶ 145                                        1. *Dissipation*

¶ 146   Elizabeth first contends that certain of the court's findings of dissipation were erroneous. Section 503(d)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d)(2) (West 2014)) lists "dissipation" as one of the factors that the court considers in dividing equitably the marital property in just proportions. "Dissipation" is defined as a " 'spouse's use of marital property for his or her sole benefit for a purpose unrelated to the marriage when the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 66 (quoting *In re Marriage of Hubbs*, 383 Ill. App. 3d 696, 700 (2006)). Whether a given course of conduct constitutes dissipation turns upon the particular facts of each case. *In re Marriage of Carter*, 317 Ill. App. 3d 546, 551 (2000). The party charged with dissipation has the burden to prove by clear and convincing evidence how the marital funds were spent. *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 50. Vague and general testimony that the funds were used for marital expenses is inadequate to meet the charged party's burden, and the court is required to find dissipation where the charged party fails to meet the burden. *Carter*, 317 Ill. App. 3d at 552. The issue of dissipation is generally a question of fact, and we will not disturb the trial court's findings unless the court's decision is against the manifest weight of the evidence and, thus, is an abuse of discretion. *In re Marriage of Seversen*, 228 Ill. App. 3d 820, 824 (1992). To clarify: we apply the manifest-weight-of-the-evidence standard of review to the court's factual findings upon which it bases its property distribution, but we apply the abuse-of-discretion standard in reviewing the court's final property distribution. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005). A decision is against the manifest weight of the evidence where the opposite conclusion is apparent. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 100. An abuse of

discretion occurs where no reasonable person could take the view adopted by the trial court. *Seversen*, 228 Ill. App. 3d at 824-25.

¶ 147   In deciding the issue of dissipation, the court must determine the credibility of the spouse charged with dissipation. *Berberet*, 2012 IL App (4th) 110749, ¶ 50. The court's credibility determinations are central to its adjudication where the parties are the primary witnesses. *Seversen*, 228 Ill. App. 3d at 824. Where dissipation has been established, the court may charge the amounts found to have been dissipated against the party guilty of dissipation. *Berberet*, 2012 IL App (4th) 110749, ¶ 51.

¶ 148   Here, the court found that Elizabeth dissipated $2,901,462.37. In making this determination, the court found that Elizabeth offered only "vague" testimony as to how she spent the marital funds. The court also found that Elizabeth was "not credible and [was] [evasive] when discussing the dissipation claims." Elizabeth argues that these findings are irrelevant, as Samuel did not contradict Elizabeth's accounts that she spent some of the money for marital purposes. However, Elizabeth's testimony was vague and general, and she did not introduce any documents into evidence corroborating her testimony, although she testified that some of those documents, such as a rental agreement, existed. We also agree that she was evasive on cross-examination. The trial court is in a better position than a reviewing court to weigh evidence. *In re Marriage of Saheb & Khazal*, 337 Ill. App. 3d 615, 624 (2007). It is well established that reviewing courts give great deference to credibility determinations by the trial court. *In re Marriage of McHenry*, 292 Ill. App. 3d 634, 641 (1997). Consequently, we will not set aside or ignore the court's credibility findings.

¶ 149   Elizabeth argues that the court's determinations as to dissipation were against the manifest weight of the evidence regarding the following eight categories.

¶ 150                    a. *$621,215.98 from Woodfield and Yorktown Stores*

¶ 151   Elizabeth admits that she took cash from the Woodfield and Yorktown Brow Art stores. She argues that her testimony that she used the cash for marital purposes, coupled with the fact that she reported the cash as income, establish that she did not dissipate those assets. Elizabeth testified that she used the cash for "any cash expenses the business had." She elaborated: "Sometimes, there would be repairs that would have to be made at locations." Or, she said, "It could be something where someone had to go in for a license and they [*sic*] just had to bring cash for it to get licenses done." Or, she testified, "[S]ometimes an employee would go and get supplies and then be reimbursed." She also testified that she would use the cash for "personal things like getting clothes for the kids, food for us, groceries for us, entertainment, movies, miniature golf, different things." Elizabeth testified that she also used cash to pay the nanny and the housekeeper. Elizabeth cites cases for the general proposition that payment of legitimate family expenses is not dissipation.

¶ 152   Simply claiming that money is spent for marital purposes, without providing the court with an accounting of the precise distribution of those funds, does not refute a charge of dissipation. *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 596 (2003). Elizabeth's explanations are general and vague statements as to how she spent the money, which are insufficient to avoid a finding of dissipation. See *Berger v. Berger*, 357 Ill. App. 3d 651, 662 (2005). In *Berger*, the wife's testimony that she used funds to pay living expenses, take her daughter on a trip to Europe, and purchase items for her new home were too vague and general to prove that the funds were spent on marital expenses. *Berger*, 357 Ill. App. 3d at 662. Accordingly, we cannot say that the court's determination that Elizabeth dissipated the cash from Woodfield and Yorktown was against the manifest weight of the evidence.

¶ 153                  b. *$633,958.31 from the Tennessee Brow Art Stores*

¶ 154   Elizabeth denied that she took cash from the Tennessee stores, and there is no documentary evidence tying her to that cash. She testified that Blake, who managed those stores and later purchased a franchise, took the cash. Samuel argues that Elizabeth invented that story. However, Samuel corroborated her testimony. Samuel testified that he had a "handshake deal" with Blake allowing Blake to take the cash. Consequently, we hold that the court's finding of dissipation of $633,958.31 from the Tennessee stores was against the manifest weight of the evidence.

¶ 155                                    c. *$59,800 in CBUSOL Transfers*

¶ 156   Elizabeth argues that these transfers were between a Brow Art checking and savings account to maintain that account's gold status (she did not specify whether the checking or savings had gold status). She cites *In re Marriage of Miller*, 342 Ill. App. 3d 988, 996 (2003), for the proposition that the transfer of one marital asset to another marital asset is not dissipation.

¶ 157   As explained above, we grant Samuel's motion to strike footnote 1 of Elizabeth's reply brief, wherein she provides an explanation of the acronym CBUSOL that is *de hors* the record. At trial, no one explained the meaning of CBUSOL.

¶ 158   Turning to the merits, Elizabeth's testimony was not so straightforward as she portrays. She initially testified that those series of transfers were for repairs to a patriarchal family home in Greece: "That was for repairs to the village house in Greece." However, confusion ensued over which exhibit her counsel was asking about. When they agreed on the exhibit (which appeared to be one of Samuel's notices of intent to claim dissipation), Elizabeth testified that the CBUSOL transfers of $1000 each were just "monthly like account maintenance transfers to keep it like a gold account because it was a business gold account and *** they transferred $1000 to savings from the checking each month." She was referring to a Perfect Brow Art Florida account.

¶ 159   On cross-examination, though, when asked if the transfers were from checking to savings, Elizabeth said, "Well, hold on a second." Then the court asked Elizabeth: "Did that [$59,800] go to Greece?" Elizabeth replied, "No." The court asked: "Did that [$59,800] go to Greece to repair the house?" Again, Elizabeth replied, "No." Then the court asked: "What did [the $59,800] go to Greece for?" Elizabeth testified: "Oh. Oh, sorry. If the $59,000 went to Greece—anything that went to Greece went for repairs to the house." She then said: "I just don't think that the amount that was taken every month *** was sent there. But if it was, anything that went to Greece, it was for repairs, yes." Elizabeth's testimony was vague and highly equivocal as to whether the transfers were between marital accounts. Consequently, the court was justified in finding that Elizabeth failed to refute that charge of dissipation.

¶ 160         d. *$44,560.36 and $11,811.50 for the Wilmot Road Property*

¶ 161   Elizabeth admits that she used Brow Art funds to pay Stanulis $44,560.36 for architectural plans and $11,811.50 for surveying and landscape work on the Wilmot Road property. She contends that these expenditures were "in the nature of a continuation of the marital lifestyle and do not constitute dissipation." Samuel argues that Elizabeth "wasted thousands and thousands of dollars" on architectural plans and other work that she did not use. Samuel points out that Elizabeth's testimony, that the cost of Stanulis's architectural renderings was included in the listing price of the property, was not true.

¶ 162   Elizabeth relies on *In re Marriage of Adams*, 183 Ill. App. 3d 296 (1989), and *In re Marriage of Davis*, 215 Ill. App. 3d 763 (1991). In *Adams*, the court held that the husband did not dissipate approximately $16,000 on cigarettes, beer, and tips over two years and four months, where that was a "small amount of funds" and the wife had not objected to the husband's frequent journeys to taverns during the marriage. *Adams*, 183 Ill. App. 3d at 303. In *Davis*, the court held

that the husband's expenditures for trips with the children and for vacations did not constitute dissipation where the husband was "merely maintaining the lifestyle that the parties had enjoyed during the marriage." *Davis*, 215 Ill. App. 3d at 777. Those cases are inapposite. Here, the sums were neither paltry nor a continuation of the parties' lifestyle.

¶ 163   Elizabeth and Samuel bought the Wilmot Road property intending to build a custom home on it. To that end, they had architectural drawings made. Elizabeth testified that those drawing were incomplete, but Samuel disputed that, and no evidence corroborates Elizabeth's claim. Had Elizabeth used the first set of drawings and built her house accordingly, she might have an argument that doing so was a continuation of the parties' lifestyle. However, Elizabeth abandoned those plans and then paid Stanulis for different drawings, which she never used. In connection with Stanulis's plans, Elizabeth incurred expenses for the surveying and landscape work. Accordingly, we cannot say that the court's finding that she dissipated those funds was against the manifest weight of the evidence.

¶ 164                     e. *$200,000 for the Kipling Lane Property*

¶ 165   Elizabeth argues that she purchased the Kipling Lane property in good faith to rehab and sell it at a profit to pay the IRS. The court found that she dissipated at least $200,000 in connection with that project, which was the loss realized on the sale of that property. Elizabeth cites *In re Marriage of Phillips*, 229 Ill. App. 3d 809 (1992), where the court held that the husband did not dissipate assets in the course of buying and selling investment properties. *Phillips*, 229 Ill. App. 3d at 825-26. However, in *Phillips*, the husband's business was selling and reinvesting in real estate. *Phillips*, 229 Ill. App. 3d at 825. The court stated: "We do not expect that [the husband] would cease business operations and cease paying daily expenses during these proceedings." *Phillips*, 229 Ill. App. 3d at 825. Here, Elizabeth's business was eyebrow threading

entrepreneurship, not investing in real estate. Elizabeth also cites *In re Marriage of Isaacs*, 260 Ill. App. 3d 423 (1994), where the court held that the wife did not dissipate assets in connection with her activities in a closely held corporation that reduced the value of its stock. *Isaacs*, 260 Ill. App. 3d at 429-30. The court held that the wife participated in such activities "for legitimate business reasons." *Isaacs*, 260 Ill. App. 3d at 430.

¶ 166   Here, instead of paying the IRS directly to reduce her obligation, Elizabeth purportedly loaned her mother $710,000 to purchase the Kipling Lane property in her mother's name. Elizabeth showed that amount as a loan on Brow Art's books, when, in fact, she used the money to make the purchase, never intending that it be a loan to her mother. Elizabeth's stated intention in placing the property in her mother's name was to avoid the IRS. Elizabeth sank another $500,000 of Brow Art funds into rehabbing the property, all the while knowing that she continued to accrue IRS penalties and interest. Thus, we cannot say that the court's finding of dissipation was against the manifest weight of the evidence.

¶ 167   f. *$176,528 to Ann Jihn, $45,000 to Brit Truckenbrod, and $33,615 to Maria Dedi*

¶ 168    Elizabeth argues that her testimony that she paid rent to Jihn and Truckenbrod, and that Dedi was paid as her personal assistant, was unrebutted. She argues that payments to those individuals were for legitimate living expenses. See *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 197 (1992) (the expenditure of marital funds by one spouse for necessary, appropriate, and legitimate living expenses when the marriage is undergoing an irreconcilable breakdown is not considered dissipation). However, in *Hagshenas*, we also said that "[i]t is entirely within the realm of possibility that one spouse's use of marital funds for his or her own living expenses at a time when the marriage is undergoing an irreconcilable breakdown could be shown to be so selfish and excessive and improper as to constitute an outright waste of marital funds." *Hagshenas*, 234 Ill.

App. 3d at 197. In *Hagshenas*, the husband testified in "specific detail as to his expenses for rent, food, clothes, and utilities ***." *Hagshenas*, 234 Ill. App. 3d at 196. In *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007), which Elizabeth also cites, the spouse charged with dissipation provided receipts showing a representative sample of expenditures. Here, as noted, Elizabeth's testimony was vague and general. When asked if she had leases to document her claims, she testified "not on me," and that Coldwell Banker would have the document. Moreover, the court specifically found her to be not credible. Where a spouse testifies to such expenditures without supporting documentary evidence, the spouse's explanation requires the court to make a credibility determination as to whether those expenditures were for a marital purpose. *Hagshenas*, 234 Ill. App. 3d at 196. Because Elizabeth offered no documents (which she claimed existed) to support her testimony, we cannot say that the court's finding of dissipation with respect to amounts paid to Jihn, Truckenbrod, and Dedi was against the manifest weight of the evidence. See *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 864-65 (1998) (if the spouse charged with dissipation does not adequately document expenditures, courts will affirm a finding of dissipation).

¶ 169                            g. *$35,000 to RGR and $5750 to Andrianakos*

¶ 170   Elizabeth testified that a $35,000 check to RGR dated February 12, 2016, was "I believe for a Boston location of [Brow Art] because RGR handled that buildout if memory serves me right." Elizabeth testified that she "believed" that the money was for the North Shore Mall because RGR was a construction company that worked on many Brow Art buildouts "in various malls in various states." Elizabeth testified that she was "not sure" if the $35,000 check was for the Boston location. On cross-examination, Elizabeth testified that she was sure that an invoice for that $35,000 payment existed, but she acknowledged that no such document was offered into evidence during her direct examination. With respect to Andrianakos, Elizabeth testified that he was an

accountant who worked for Brow Art. However, she offered no documentary evidence of services that Andrianakos provided.

¶ 171    Elizabeth cites *In re Marriage of Calisoff*, 176 Ill. App. 3d 721 (1998), for the proposition that the payment of legitimate business expenses does not constitute dissipation. *Calisoff* is distinguishable because in that case the respondent "produced exhaustive proof as to the dispersal of said funds for marital purposes." *Calisoff*, 176 Ill. App. 3d at 728. Here, Elizabeth was vague with respect to the payment to RGR, and she provided no proof of any accounting services that Andrianakos performed. Accordingly, we cannot say that the court's finding of dissipation was against the manifest weight of the evidence.

¶ 172                    h. *$445,860.20 in Income Tax Penalties and Interest*

¶ 173    Elizabeth maintains that (1) she was unable to pay income taxes as they became due because she was required to use available funds to pay the costs of litigation, Samuel's interim maintenance, their son's special schooling, and extraordinary business expenses, and (2) she affirmatively took steps to manage her tax liability, such as selling the Wilmot Road and Kipling Lane properties, as well as Brow Art. She argues that "there was simply no way to keep up with all the expenses."

¶ 174    The record shows that Elizabeth was paying herself an annual salary of $455,000. She testified that she could not meet her expenses on that amount, so she took distributions from Brow Art. From 2014 through the time of trial, those distributions totaled almost $19 million. She spent significant sums on jewelry ($127,000 for a diamond), properties in Greece, a Cadillac for her mother, travel, high end clothing stores, and real estate. In the process, she ran up a $1.9 million tax debt. Instead of paying the IRS, Elizabeth purchased the Kipling Lane property for $710,000 and paid another $500,000 to renovate it, knowing that she was accruing additional tax interest

and penalties while doing so. Elizabeth's reliance on *In re Marriage of Parker*, 252 Ill. App. 3d 1015 (1993), is misplaced. In *Parker*, the court held that the wife, who did not earn enough to pay the mortgage, did not dissipate assets when the marital home went into foreclosure. *Parker*, 252 Ill. App. 3d at 1019. The wife in *Parker* lost her $20,000-per-year job, lived on unemployment compensation and a loan, and found work again earning only $11,713. *Parker*, 252 Ill. App. 3d at 1019. The present case is more like *In re Marriage of Aslaksan*, 148 Ill. App. 3d 784, 789 (1986), where the husband had the financial means to make mortgage payments but ceased doing so. Accordingly, we cannot say that the court's finding of dissipation was against the manifest weight of the evidence.

¶ 175                              2. Samuel's $125,000 in Pre-distributions

¶ 176   The court made two pre-distributions of the marital estate to Samuel totaling $125,000. Elizabeth correctly argues that the AJDOM failed to include those pre-distributions in the court's determination of assets and liabilities. Samuel does not respond to this argument. An appellee's failure to respond to an argument raised in the appellant's brief may amount to a concession. *Macknin v. Macknin*, 404 Ill. App. 3d 520, 528 (2010). Accordingly, we hold that Samuel's award should be reduced by $125,000.

¶ 177                              3. The Asset Allocation

¶ 178   Elizabeth contends that she was not awarded any assets while Samuel was awarded "a variety of income-producing properties as well as the former marital residence." Elizabeth argues that, although her dissipation was the "on-paper" basis for the court's allocation, the court did not provide her the means to move forward with her life and support her children. Specifically, Elizabeth argues that (1) the court did not account for the fact that she has "effectively 100% responsibility for the four minor children" and (2) the court treated her $455,860.20 penalties-and-

interest tax liability as dissipation but excluded it from the marital estate, thus rendering "illusory" the court's equal division of the marital estate.

¶ 179   Because we have determined that one of the court's findings of dissipation was against the manifest weight of the evidence, and we have also determined that the court erred in failing to include Samuel's pre-distributions in its computation, we vacate the property distribution and remand for further proceedings. However, we will consider Elizabeth's arguments, as these issues may arise on remand.

¶ 180                           a. *The Award of Dissipation*

¶ 181   The touchstone of the proper apportionment of property is whether the distribution is equitable. *In re Marriage of Wolf*, 180 Ill. App. 3d 998, 1004 (1989). The Act does not require an equal division of property, but an equitable one. *Wolf*, 180 Ill. App. 3d at 1004. We will not disturb a division of marital property unless the court abused its discretion. *Wolf*, 180 Ill. App. 3d at 1004.

¶ 182   Here, the court awarded Elizabeth her dissipation in the amount of $2,901,462.37 and awarded Samuel the remaining marital estate. The court then entered judgment against Elizabeth for the deficiency to make the distribution 50-50. It is not an abuse of discretion for a court to enter judgment against the spouse who is guilty of dissipation for the entire amount of that dissipation. *In re Marriage of Jerome & Martinez*, 255 Ill. App. 3d 374, 394 (1994). As noted, on remand, the amount of Elizabeth's dissipation will change.

¶ 183                           b. *The $445,860.20 Tax Penalty and Interest*

¶ 184   The court excluded the $445,860.20 tax penalty-and-interest liability from the marital estate without explaining its reasoning. Pursuant to section 503(a) of the Act (750 ILCS 5/503(a) (West 2018)), "marital property" means "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," with a number of exceptions that do not

apply here. After the court classifies property as either marital or nonmarital, it then divides the marital property. 750 ILCS 5/503(b)(1) (West 2018). Samuel offers no reason why the $445,860.20 tax penalty and interest should not be classified as marital property. Consequently, on remand, the court shall include this debt as marital property.

¶ 185                                    c. *Custodial Provisions*

¶ 186   Section 503(d) of the Act (750 ILCS 5/503(d) (West 2018)) requires the trial court to consider the custodial provisions for the children when dividing property. Elizabeth relies on *In re Marriage of Forbes*, 251 Ill. App. 3d 133, 137 (1993), for her argument that she should be awarded a larger share of the marital estate because she has custody of the four minors. She asserts that she "walked out of the divorce" with 100% responsibility for the children, "less than zero assets, a substantial maintenance obligation, no child support, and, at best, a speculative future income given the demise of Brow Art ***." We reject this argument, given that, later in this Order, we will (1) vacate the property award and the zero-dollar child support award (*Infra*, ¶ 205) (2) and hold that Samuel is not entitled to maintenance (*Infra*, ¶ 215).

¶ 187                                    d. *Installment Payments*

¶ 188   Lastly, Elizabeth cites *In re Marriage of Banach*, 140 Ill. App. 3d 327 (1986), in support of her argument that the court should have allowed her to make installment payments to Samuel for his share of the property division. In *Banach*, the court rejected the wife's argument that she should have been awarded the parties' restaurant under a cash repayment plan where, by her own testimony, she would not have been able to make the payments. *Banach*, 140 Ill. App. 3d at 336. Thus, *Banach* is not applicable.

¶ 189                                    4. Paragraph 3.3 of the AJDOM

¶ 190    In paragraph 3.3 of the AJDOM, the court required Elizabeth to be financially responsible for any liens or encumbrances on any of the real properties awarded to Samuel "which may have been caused by Elizabeth's actions or inactions." Paragraph 3.3 also provided that Elizabeth "shall indemnify, defend and hold Samuel harmless from any liability thereon." Elizabeth argues that this provision was entered (1) without any evidence concerning liens and encumbrances on those properties and (2) in the absence of specific findings as to the amounts of those debts. Specifically, Elizabeth maintains that section 503(a) of the Act requires such findings, as section 503(a) includes debts in the definition of marital property. 750 ILCS 5/503(a) (West 2018). Section 503(a) requires the court to "make specific factual findings as to its classification of assets as marital or non-marital property, values, and other factual findings supporting its property award." 750 ILCS 5.503(a) (West 2018). Samuel argues that paragraph 3.3 of the AJDOM is not a distribution of marital debt, but an indemnification clause, as Elizabeth had control of those properties until entry of the AJDOM.

¶ 191    In paragraph 3.1 of the AJDOM, the court awarded Samuel the following properties "free and clear of any right or claim to title and/or interest by Elizabeth" and noted their values: (1) 887 Auburn Court, Highland Park, valued at $465,000 (the former marital residence), (2) 1240 Park Avenue W., Apt 311, Highland Park, valued at $135,000, (3) 2125 Wilmot Road, Bannockburn, valued at $649,000 (the Wilmot Road property), (4) 5821 Legacy Crescent Place, Unit 103, Riverview Florida, valued at $52,500 and subject to a mortgage of $103,624 and a property assessment of $8,868, (5) 3450 S. Ocean Boulevard, Palm Beach, Florida, valued at $170,000, and (6) 5080 N. Drive, Apt 8D, Riviera Beach, Florida, valued at $515,000.

¶ 192    In paragraph 3.2 of the AJDOM, the court required Elizabeth, within 7 days of entry of the AJDOM, to execute quitclaim deeds to those properties to Samuel. In paragraph 3.4, the court

provided that, upon entry of the AJDOM, Samuel shall be "solely and separately responsible" for "all payments associated with the ownership and operation" of the real properties, including payments of mortgages, taxes, insurance, upkeep, maintenance, repairs, and utilities. In addition, Samuel was ordered to hold Elizabeth harmless for those items. In paragraph 3.5, the court ordered Elizabeth to pay to Samuel all rental income received from the Legacy Crescent Place Florida property for April through June 2019, within 60 days of entry of the AJDOM. Paragraph 3.5 also required Elizabeth to pay Samuel, within 60 days, all rental receipts from July 2019 forward until Samuel was named as the lessor.

¶ 193 Elizabeth claims, without citing any authority, that paragraph 3.3 "runs afoul" of section 503(a)'s specificity requirement by allocating 100% of "unknown obligations" to Elizabeth. Elizabeth terms this a "blind future allocation." We disagree. Paragraph 3.3 must be read in concert with paragraphs 3.1, 3.2, 3.4, and 3.5. Together, those provisions effectuate the court's intention that Samuel receive the properties free and clear of Elizabeth's interests.

¶ 194            5. The Deficiency Judgment and the Life Insurance Obligation

¶ 195 Elizabeth contends that the court's deficiency judgment was improperly calculated, as she was not awarded a judgment against Samuel for his share of the principal tax liability, Samuel was given assets free of liabilities, and paragraph 3.3 of the AJDOM required Elizabeth to contribute additional sums. These arguments merely restate those disposed of above. However, because we have determined that the court's finding of a portion of the dissipation was against the manifest weight of the evidence, that the court should have included Samuel's pre-distributions in its award, and that the tax penalties and interest shall be included in the marital estate, we agree that the deficiency judgment, if any, will have to be recalculated.

¶ 196   Next, Elizabeth argues that the court was without authority to order the deficiency judgment to be secured by life insurance. Elizabeth cites section 503(b-5)(1) of the Act (750 ILCS 5/503(b-5)(1) (West 2018)), which is silent with respect to whether the court can require a party to secure a property judgment with life insurance. Samuel argues that, because section 503(b-5)(1) allows the court to assign ownership and death benefits of a life insurance policy, "Elizabeth's objection is hard to understand." Her objection is that assigning ownership of a policy as part of a property distribution is not the same thing as requiring a policy to secure a property judgment. This issue requires us to construe section 503(b-5)(1) of the Act. The primary rule of statutory construction is to discern the legislature's intent. *In re Marriage of Ellinger*, 378 Ill. App. 3d 497, 499 (2008). The best evidence of that intent is the statutory language itself, which must be given its plain and ordinary meaning. *Ellinger*, 378 Ill. App. 3d at 499. Statutory construction is a question of law, which we review *de novo*. *Ellinger*, 378 Ill. App. 3d at 499.

¶ 197   In *Ellinger*, the trial court ordered the husband to name the wife as beneficiary of his life insurance policy as security for the husband's maintenance obligation. *Ellinger*, 378 Ill. App. 3d at 499. The trial court analogized the use of life insurance to secure maintenance to the use of life insurance to secure a child support obligation. *Ellinger*, 378 Ill. App. 3d at 500. The appellate court noted that the Act's language regarding maintenance did not provide for such use of life insurance and concluded that the trial court erred. *Ellinger*, 378 Ill. App. 3d at 500-01. The court stated that it presumed that the legislature intended different results by using different language in different parts of the statute. *Ellinger*, 378 Ill. App. 3d at 500.

¶ 198   Under the current maintenance statute, a maintenance award may be reasonably secured by life insurance. 750 ILCS 504(b-8)(f) (West 2018). However, there is no similar provision in section 503 governing property distribution. Section 503(b-5)(1) does not authorize the court to

require life insurance to secure a property obligation. Therefore, we presume that the legislature did not intend such a result. See *Ellinger*, 378 Ill. App. 3d at 500. We also note that neither the trial court, nor the parties in our case, cite to any authority permitting the court to impose such a requirement. Accordingly, we hold that the court's requirement that Elizabeth maintain a life insurance policy as security for the deficiency judgment was an abuse of discretion.

¶ 199                                6. Child Support

¶ 200   Elizabeth contends that the court erred in setting Samuel's child support obligation at zero, considering the substantial amount of maintenance awarded to Samuel, his income-producing properties, and his imputed yearly income of $50,000. Elizabeth argues that (1) the court's failure to consider maintenance is error, (2) the AJDOM is devoid of analysis of the statutory child support factors, (3) the court failed to consider what standard of living the children would have enjoyed absent the divorce, and (4) the court erred in not considering the cost of health insurance for the children. The trial court has the discretion to determine the appropriate amount of child support, and we will not reverse that determination absent an abuse of discretion. *In re Marriage of Gabriel & Shamoun*, 2020 IL App (1st) 182710, ¶ 56.

¶ 201   Paragraph 14 of the AJDOM addressed child support: "Upon entry of the [AJDOM], neither party shall be obligated to pay child support to the other as the maintenance amount above takes into consideration Samuel's contribution to child-related expenses." The court set maintenance at $7100 per month for 55 months, which is reviewable prior to when Samuel is due to receive his 55th payment. This reviewable maintenance obligation is almost half of what the court set as temporary maintenance.

¶ 202   The court also addressed child support in paragraph 77 of the AJDOM:

"The court finds that, in this case an award of child support from one party to the other is inappropriate, as the reviewable maintenance amount set forth above (consistent with the order of March 8, 2016) already takes into consideration and included an amount of contribution to child-related expenses. Child support is set at 0 from Samuel to Elizabeth based on their respective incomes."

¶ 203    Samuel argues that the court based the child support and maintenance awards on the factors contained in section 504 of the Act (750 ILCS 5/504 (West 2018)) for setting maintenance and on the parties' salaries. Samuel emphasizes that Elizabeth's salary was $455,000 per year, whereas Samuel's imputed yearly income was $50,000. Further, Samuel argues that Elizabeth "pillaged" millions of dollars from Brow Art. Samuel cites no authority for his argument that one spouse's dissipation of assets negates the other spouse's duty to pay child support.

¶ 204    Section 505 of the Act (750 ILCS 5/505 (West 2018)) governs child support. Section 505(a) (750 ILCS 5/505(a) (West 2018)) provides that the court may order either or both parents owing a duty of support to pay an amount that is "reasonable and necessary" for support. The duty of support includes the obligation to provide for the reasonable and necessary physical, mental, and emotional health needs of the child. 750 ILCS 5/505(a) (West 2020). Pursuant to section 505(a)(1) (750 ILCS 5/505(a)(1) (West 2018)), the Illinois Department of Healthcare & Family Services established child support guidelines that include a schedule of basic support obligations. Section 505(a)(1.5) (750 ILCS 5/505(a)(1.5) (West 2018)) provides that the court "shall" compute the basic child support obligation by (1) determining each parent's monthly net income, (2) adding the parents' net monthly incomes together to determine their combined net monthly income, (3) selecting the corresponding appropriate amount from the schedule of basic child support obligations based on the parties' combined net monthly income and their number of children, and

(4) calculating each parent's percentage share of the basic support obligation. The court *must* apply the guidelines unless the court makes a finding that application of the guidelines would be inappropriate, after considering the best interests of the child and evidence of the following relevant factors: (1) the financial resources and needs of the child, (2) the financial needs and resources of the parents, (3) the standard of living that the child would have enjoyed had the marriage not been dissolved, and (4) the physical and emotional condition of the child and his or her educational needs. 750 ILCS 5/505(a)(2) (West 2018). There is a rebuttable presumption that the amount of the child support obligation that results from application of the guidelines is the correct amount of child support. 750 ILCS 5/505(a)(3.3) (West 2018). The proponent of a deviation from the guidelines has the burden of producing evidence that compelling reasons exist to justify the deviation. *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 29. Any deviation from the guidelines "shall" be accompanied by the court's written findings specifying the reasons for the deviation and the presumed amount without a deviation. 750 ILCS 5/505(a)(3.4) (West 2018). Pursuant to section 505(a)(3.3b) (750 ILCS 5/505(a)(3.3b) (West 2018), a zero-dollar child support order is permitted for parents with no gross income, who receive only means-tested assistance, or who cannot work due to a medical disability, incarceration, or institutionalization.

¶ 205    In *Hill*, we noted that a court is justified in awarding child support below the guidelines where the parties' incomes are more than sufficient to provide for the reasonable needs of the parties' children. *Hill*, 2015 IL App (2d) 140345, ¶ 30. Regarding a parent who has a high income, the court must balance the concerns that a child-support award is not windfall and that the children's standard of living should be maintained. *Hill*, 2015 IL App (2d) 140345, ¶ 30. Here, the court found that Elizabeth's annual income was $455,000 and Samuel's imputed yearly income was $50,000. Even so, the court was *required* to apply the guidelines or justify its deviation with

written findings for its reasons, which may include (1) extraordinary medical expenditures necessary to preserve the life or health of the child, (2) additional expenses for a child with special medical, physical, or developmental needs, and (3) any other factor that the court determines should be applied, after considering the best interests of the child. See 750 ILCS 5/505(a)(3.4) (West 2018). Here, the court neither applied the guidelines nor entered written findings for its deviation from them. Consequently, we vacate the zero-dollar award of child support and remand for further proceedings that are consistent with the mandates of section 505.

¶ 206                                    7. Maintenance

¶ 207    Elizabeth argues that (1) Samuel is not entitled to any maintenance, (2) the court failed to comply with section 504(b-2)(1) of the Act, which requires the court to make specific findings of fact and to state its reasons for awarding or refusing to award maintenance, (3) the court abused its discretion in failing to give Elizabeth credit for the amount of interim maintenance that she paid to Samuel, and (4) the court abused its discretion in requiring Elizabeth to maintain a $4 million life insurance policy to secure her maintenance obligation. Because the court tied its child support award to maintenance, and we vacate the child support award, we also vacate the maintenance award. However, in the interest of judicial economy, we will address whether the court erred in awarding Samuel any maintenance. See *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 92 (court would address maintenance issues likely to recur on remand).

¶ 208    Maintenance awards are governed by section 504 of the Act, which sets forth 15 factors that the court must consider in deciding whether to award spousal maintenance. 750 ILCS 5/504 (West 2018). Those factors include: (1) the income and property of each party, (2) each party's needs, (3) the realistic present and future earning capacity of each party, (4) any impairment of the party seeking maintenance due to that party devoting time to domestic duties or having foregone

or delayed education, training, employment, or career opportunities due to the marriage, (5) any impairment of the realistic present and future earning capacity of the party against whom maintenance is sought, (6) the time necessary to enable the party seeking maintenance to acquire appropriate training, education, and employment, and whether that party is able to support himself or herself through appropriate employment, (6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment, (7) the standard of living established during the marriage, (8) the marriage's duration, (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of the parties, (10) all sources of public and private income, including retirement and disability income, (11) the tax consequences to each party, (12) contributions and services of the party seeking maintenance to the education, training, career or career potential, or license of the other spouse, (13) any valid agreement of the parties, and (14) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2018). No single factor is determinative when considering the amount and duration of a maintenance award. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 651 (2008). Further, the trial court is not limited to a review of the factors in setting a maintenance award. *Heroy*, 385 Ill. App. 3d at 651.

¶ 209   Generally, the trial court's determination as to awarding maintenance is presumed to be correct. *Heroy*, 385 Ill. App. 3d at 650. Such awards are within the court's discretion, and we will not disturb a maintenance award absent an abuse of discretion. *Heroy*, 385 Ill. App. 3d at 650. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Heroy*, 385 Ill. App. 3d at 651. The party challenging the maintenance award has the burden to show an abuse of discretion. *Heroy*, 385 Ill. App. 3d at 651.

¶ 210   There are four common types of maintenance included in a final judgment: (1) permanent maintenance (indefinite duration), (2) rehabilitative maintenance (for a fixed term that terminates at the term's end or on the occurrence of some event), (3) rehabilitative maintenance (subject to a set review date), and (4) maintenance in gross (a specific, nonmodifiable sum, usually in lieu of property). *Shen v. Shen*, 2015 IL App (1st) 130733, ¶ 84. Here, the court awarded Samuel rehabilitative maintenance subject to a set review date. The court set maintenance at $7100.52 per month for 55 months, with Samuel to file a petition to review maintenance prior to receiving his 55th payment. The court recited that it considered the section 504(a) factors, particularly factors (1), (3), (6), and (9). The court stated that it based its maintenance award upon a "full analysis of all of the factors," and the "totality of circumstances of this case." However, the court did not "state its reasoning" for awarding Samuel maintenance, as required by section 504(b)(b-2) of the Act (750 ILCS 504(b)(b-2) (West 2018)). In awarding rehabilitative maintenance for 55 months, the court did not require Samuel to seek employment or undergo training for suitable employment during those 55 months.

¶ 211   Elizabeth argues that the court abused its discretion in awarding Samuel rehabilitative maintenance where Samuel (1) was 48 years old, (2) was awarded substantial properties, (3) did nothing during the years that the divorce was pending to become self-sufficient, (4) made no efforts to become employed, and (5) traveled extensively for pleasure internationally with a personal assistant instead of finding work. The purpose of rehabilitative maintenance is to " 'provide incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency.' " *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 972-73 (1997) (quoting *In re Marriage of Toole*, 273 Ill. App. 3d 607, 611 (1995)).

¶ 212 Here, the court considered Samuel's limited education[13] and his early employment as a construction and bakery worker after he left Iraq as a very young man and before he settled in Chicago the second time. Using this background, which did not account for Samuel's later prowess as a businessman, the court imputed $50,000 in yearly income to him. However, as the court also noted, Samuel is an entrepreneur. Indeed, in pleadings, Samuel identified himself as an "entrepreneur by profession." Just before Samuel met Elizabeth, he was a principal in a successful parking lot/valet business, with up to 50 employees, that thrived until the company lost its leases due to development. Samuel testified that, after Elizabeth came to him with the Brow Art idea, he was the sole force behind its financial success. Samuel testified that he was the "whole nine yards," while Elizabeth brought the mail into the office. Thus, the record established that Samuel is not limited to menial, low-paying jobs and that he has at least the same earning potential as Elizabeth. Because Samuel was voluntarily unemployed, the court correctly imputed income to him. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30 (court imputes income where a spouse is voluntarily unemployed). However, imputed income must align with that party's skills and experience. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40. The court should not rely on outdated information that is not reflective of prospective income. *In re Marriage of Liszka*, 2013 IL App (3d) 150238, ¶ 47.

¶ 213 Rehabilitative maintenance is appropriate where the evidence shows a potential for future employability at an income that allows approximately the same standard of living as that enjoyed during the marriage. *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 23. Inherent in the concept of rehabilitative maintenance is the goal that, after renewing skills and reentering the job

---

[13] By contrast, Elizabeth has two master's degrees.

market, the recipient will become self-sufficient. *Heasley*, 2014 IL App (2d) 130937, ¶ 23. A former spouse receiving rehabilitative maintenance has the obligation to find appropriate employment. *In re Marriage of Courtright*, 229 Ill. App. 3d 1089, 1091 (1992). Here, it is undisputed that Samuel did not seek any type of employment after he ceased working for Brow Art in 2013, nor did he attempt to start any other businesses. A maintenance award is used only to help the recipient spouse transition between marriage and life after the dissolution of the marriage. *In re Marriage of Haas*, 215 Ill. App. 3d 959, 964 (1991). Here, Samuel has evinced no desire or intention to transition to work.

¶ 214   Elizabeth relies on *In re Marriage of Cantrell*, 314 Ill. App. 3d 623 (2000). In *Cantrell*, this court held that the trial court abused its discretion in failing to terminate the former husband's maintenance obligation to his former wife. *Cantrell*, 314 Ill. App. 3d at 629. We held that a recipient spouse's failure to make good-faith efforts to seek employment can be a basis upon which to deny a petition to modify maintenance. *Cantrell*, 314 Ill. App. 3d at 629. In *Cantrell*, the former wife, with the assistance of maintenance, obtained a higher degree with honors, was employable, received a substantial amount of assets in the divorce, had no health impairments, yet in the four years post-divorce had "done little" toward finding gainful employment or advancing her efforts to become self-sufficient. *Cantrell*, 314 Ill. App. 3d at 630. Under these circumstances, we held that continued maintenance was a "disincentive" toward the goal of financial independence, prolonged litigation expenses, and discouraged judicial economy. *Cantrell*, 314 Ill. App. 3d at 630.

¶ 215   Samuel argues that the court did not abuse its discretion in awarding rehabilitative maintenance where Elizabeth "threw [Samuel] out of the business and went on a financial rampage." This argument does not address that Samuel has remained voluntarily unemployed and is not even required by the AJDOM to seek employment during the 55 months of rehabilitative

maintenance. Where a spouse dissipates *all* of the marital property, such that there is nothing left, dissipation may be considered when awarding maintenance. *Aslaksen*, 148 Ill. App. 3d at 791. That is not the case here. Samuel was awarded assets worth $2.4 million, some of them income producing. For these reasons, we hold that the court abused its discretion in awarding Samuel maintenance. Upon remand, maintenance as to both parties is barred.

¶ 216                           B. Elizabeth's Appeal—No. 2-19-1120

¶ 217   Elizabeth appeals the court's November 26, 2019, order holding her in contempt for failing to comply with paragraph 3.3 of the AJDOM, which required her to indemnify and hold Samuel harmless for liens and encumbrances on the real properties awarded to him.

¶ 218   On September 12, 2019, Samuel filed a petition for rule to show cause alleging that Elizabeth willfully violated paragraph 3.3 of the AJDOM because certain "encumbrances, clouds of title and outstanding obligations" on the properties that Samuel was awarded existed "as of the date of the [AJDOM]," which Elizabeth refused to pay. Those items consisted of unpaid real estate taxes plus associated penalties, a mechanic's lien, and a condominium association lien. On October 25, 2019, the court ordered Elizabeth to pay the amounts outstanding pursuant to paragraph 3.3 of the AJDOM. On November 26, 2019, in a handwritten form order, the court found that Elizabeth had failed to pay in accordance with its October 25 order, sentenced her to 90 days' incarceration in the Lake County jail, and set a purge amount at $55,000.[14] We review a finding of contempt for abuse of discretion. *In re Marriage of O'Malley ex rel. Godfrey*, 2016 IL App (1st) 151118, ¶ 25.

---

[14] This contempt order also encompassed other matters.

¶ 219   Elizabeth first argues that, as paragraph 3.3 of the AJDOM is invalid, the contempt order must fall. However, we have already determined that paragraph 3.3 does not violate section 503 of the Act.

¶ 220   Next, Elizabeth argues that Samuel failed to allege, let alone prove, that the various encumbrances were placed against the properties due to her "action" or "inaction." However, it is undisputed that Elizabeth was in control of those properties, and in title, when those encumbrances were placed of record.

¶ 221   Next, Elizabeth argues that Samuel's claim is barred by *res judicata* because he could have determined before the AJDOM was entered that the properties were encumbered. This argument misses the mark. The court did not "reallocate" marital debt in paragraph 3.3. The court awarded Samuel the real properties, intending that he be responsible for any debts associated with those properties going forward from the date that the court ruled on the parties' motion to reconsider the original JDOM, and that Elizabeth indemnify and hold him harmless for those encumbrances incurred before that date.[15]

¶ 222   Next, Elizabeth argues that paragraph 3.4 of the AJDOM obligates Samuel to be "solely responsible" for "all payments" associated with the real properties, which bars his claim that she must indemnify him for any encumbrances. Paragraph 3.4 provides that Samuel will be responsible for all payments associated with the "ownership and operation" of the real properties upon entry of the JDOM. At the October 25, 2019, hearing, the court orally modified that date to reflect the date that it ruled on the motions to reconsider the JDOM. Thus, paragraph 3.4 is not inconsistent

---

[15] The court orally established the date as of its ruling on the motions to reconsider at the October 25, 2019, hearing.

with paragraph 3.3, because paragraph 3.3 references any encumbrances existing before Samuel was to acquire sole title. Accordingly, we hold that the court did not abuse its discretion in holding Elizabeth in contempt for failure to comply with paragraph 3.3 of the AJDOM.

¶ 223                                    C. Samuel's Cross-Appeal

¶ 224                              1. *Monies Elizabeth Spent on Ooh La La*

¶ 225    Samuel contends that the court's finding that the almost $8 million of Brow Art funds that Elizabeth spent on Ooh La La was not dissipation was against the manifest weight of the evidence. Samuel argues that every Ooh La La location was unprofitable and that Elizabeth's excuse for starting that business—that mall landlords required her to open blowdry bars to keep her Brow Art leases—was not corroborated.

¶ 226   Samuel relies on *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147. In *Schneeweis*, the husband engaged in a series of financial transactions involving the parties' bank and brokerage accounts without telling his wife. *Schneeweis*, 2016 IL App (2d) 140147, ¶¶ 5-8. Then, suddenly, and without consulting his wife, the husband quit his computer job and became a high-risk day trader. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 10. Without any trading experience, the husband went through all of the family's financial assets. *Schneeweis*, 2016 IL App (2d) 140147, ¶¶ 12-18. The trial court found that the husband dissipated nearly $1 million. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 26. On appeal, the husband argued that his conduct did not constitute dissipation because his losses were occasioned by a stock market crash. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 38. The husband argued that he traded in good faith but experienced bad luck. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 38. In rejecting these arguments, we noted that the husband, who was the family's sole financial provider, was aware of the "devastating" effect his conduct could have, yet

he deliberately chose to increase the risk to his family by "recklessly" gambling with his family's security. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 43.

¶ 227 *Schneeweis* is distinguishable. The record shows that Elizabeth knew the beauty industry, having worked in it during her adult life. She also was an experienced and highly successful entrepreneur in that industry. She testified that, based on her experience, and having done due diligence, she calculated that establishing blowdry bars would not be that different from starting up Brow Art. She also consulted with her business consultant before embarking on Ooh La La. That she turned out to be wrong does not mean that she acted recklessly or in bad faith.

¶ 228 It is not the court's role to account for bad business decisions. *In re Marriage of Getautas*, 189 Ill. App. 3d 148, 155 (1989). In *Getautas*, this court defined "dissipation" in part as to "spend funds foolishly." *Getautas*, 189 Ill. App. 3d at 155. In *Schneeweis*, the husband spent funds foolishly because he had no experience as a day trader and gambled away all of his family's assets. *Schneeweis*, 2016 IL App (2d) 140147, ¶ 43. Here, the court found that Elizabeth reasonably took a business risk that failed. We cannot say that this finding was against the manifest weight of the evidence.

¶ 229                              2. *The $1,459,269 Principal Tax Liability*

¶ 230 Samuel argues that the court abused its discretion in making him 50% liable for the principal tax obligation that Elizabeth incurred when she failed to pay income taxes on distributions. Samuel asserts that he did not benefit from those distributions. He relies on *In re Marriage of Rimmele*, 102 Ill. App. 3d 88 (1981). In *Rimmele*, the trial court valued the marital estate by deducting $28,000 that the husband unilaterally withdrew from his profit sharing plan, which, after setting aside $10,000 for taxes, he used to gamble, take a vacation, and buy a vehicle for his brother. *Rimmele*, 102 Ill. App. 3d at 880-81. On appeal, the wife argued that the tax liability

should not have been deducted from the marital estate. *Rimmele*, 102 Ill. App. 3d at 881. The appellate court agreed with the wife, holding that, because the wife did not share in the fruits of the husband's withdrawal, she should not share in paying his tax liability. *Rimmele*, 102 Ill. App. 3d at 881. *Rimmele* is distinguishable. Here, the court found that the principal tax liability was a marital debt pursuant to section 503(a) of the Act. The court then allocated half that debt to Samuel but ordered Elizabeth to pay the penalties and interest. Unlike in *Rimmele*, the record shows that Samuel benefited from the untaxed income. At a minimum, Elizabeth paid Samuel maintenance and his attorney fees from marital funds.

¶ 231   We adopt the reasoning in *In re Marriage of Griffith*, 2017 IL App (3d) 150480-U. See *Byrne v. Hayes Beer Distributing Co.*, 2018 IL App (1st) 172612, ¶ 22 (the appellate court may adopt the reasoning in an unpublished order). In *Griffith*, the court held that the trial court's distribution of a portion of the husband's tax liabilities to the wife was not an abuse of discretion where (1) the court allocated the penalties, interest, and collection fees to the husband and (2) the wife benefited from the unreported income by receiving a paycheck from the husband's business and enjoying a lifestyle that included five vacation properties in addition to the marital home. *Griffith*, 2017 IL App (3d) 172612, ¶¶ 35, 36. Accordingly, we determine that the court's allocation of 50% of the principal tax liability to Samuel was not an abuse of discretion.

¶ 232                     3. *Samuel's Attorney Fees*

¶ 233   In paragraph 18.1 of the AJDOM, the court provided that "both parties shall be responsible to pay all of their respective [attorney] fees." In paragraph 18.3, the court provided that Samuel "shall be solely and separately responsible for the payment of his own [attorney] fees and costs incurred in this matter." The court further provided that Samuel "is hereby barred from any claim against Elizabeth for contribution to his [attorney] fees and costs incurred in this matter."

¶ 234    Samuel contends that the court abused its discretion in requiring him to be responsible for his own attorney fees and costs where (1) he has "vastly" less earning capacity than Elizabeth, (2) his maintenance is inadequate to pay his legal bills, and (3) Elizabeth dissipated a "huge" portion of the marital estate.

¶ 235    In Illinois, each party pays his or her own attorney fees unless the party seeking fees is unable to pay and the other party has the ability to do so. *Berger*, 357 Ill. App. 3d at 662. We will not reverse the trial court's decision to deny fees unless the court abused its discretion. *Berger*, 357 Ill. App. 3d at 662.

¶ 236    Here, Samuel has not demonstrated that he is unable to pay his own fees. He was awarded $2.4 million in assets, some of which is income-producing property. Therefore, he has not shown that paying his fees of approximately $400,000 will deplete his estate. See *Berger*, 357 Ill. App. 3d at 662 (wife failed to show that she was unable to pay her own fees in light of her property distribution). Where the parties' financial situation indicates that both parties can pay their respective attorney fees, the court does not abuse its discretion in so ordering. *In re Marriage of Drummond*, 156 Ill. App. 3d 672, 684 (1987). Further, Samuel has the ability to earn income commensurate with Elizabeth. As discussed above, Samuel worked as a laborer early in life but became a successful entrepreneur and businessman in his own right. By his own admission, he was the sole force behind Brow Art's success. Yet, in his forties, he simply chooses not to work. Nowhere in Samuel's argument does he say that he intends to do anything except live on the maintenance that he was (erroneously) awarded.

¶ 237    We also note that both parties were litigious, resulting in astronomical fees. See *In re Marriage of Schneider*, 214 Ill. 2d 152, 174-75 (2005) (requiring wife to pay her own attorney fees was not an abuse of discretion where both parties were litigious and quarrelsome, and the wife

failed to show that payment of her fees would strip her of support or undermine her financial stability). Although Elizabeth's dissipation accounted for much of this litigation, Samuel cannot lay all of the blame there.

¶ 238   Finally, Samuel argues that we must equalize his and Elizabeth's fees. As Samuel cites no authority for this argument, we deem it forfeited. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (argument is forfeited where proponent fails to cite relevant authority).

¶ 239                                    D. Summary

¶ 240   For convenience, we summarize our decision. Elizabeth's appeal No. 19-0559: (1) the finding that Elizabeth dissipated $633, 958.31 from the Tennessee stores is reversed; the remaining findings of dissipation are affirmed; (2) Samuel's $125,000 in pre-distributions must be credited to Elizabeth on remand; (3) the $445,860.20 in income tax penalties and interest shall be included in the marital estate on remand; (4) the requirement that Elizabeth pay outstanding liens and encumbrances on the real properties awarded to Samuel is affirmed; (5) the requirement that Elizabeth maintain a life insurance policy to secure any deficiency judgment on Samuel's award of marital property is reversed; (6) the zero-dollar child support award is vacated and remanded for further proceedings consistent with this Order; (7) the maintenance award to Samuel is reversed; and (8) the matter is remanded for recalculation of the division of the marital estate consistent with this Order.

¶ 241   Samuel's cross-appeal in No. 19-0559: (1) the court's finding that Elizabeth's expenditures in connection with Ooh La La was not dissipation is affirmed; (2) the court's allocation of 50% of the principal tax liability of $1,459,269 to Samuel is affirmed; and (3) the court's determination that each party is responsible for his or her own attorney fees and costs is affirmed.

¶ 242   Elizabeth's appeal in No. 19-1120: the court's finding of contempt is affirmed.

¶ 243                                    III. CONCLUSION

¶ 244   For the reasons stated, in appeal No. 19-0559, we affirm the judgment of the circuit court of Lake County in part, reverse in part, vacate in part, and remand for further proceedings consistent with this Order. In the cross-appeal in No. 19-0559, we affirm. In appeal No. 19-1120, we affirm.

¶ 245   Appeal No. 19-0559: Affirmed in part, reversed in part, vacated in part, and remanded.

Cross-Appeal No. 19-0559: Affirmed.

Appeal No. 19-2011: Affirmed.